Matthew L. Sharp. Esq.
Nevada Bar No. 4746
**MATTHEW L. SHARP, LTD.**
432 Ridge St.
Reno, NV 89501
Phone: (775) 324-1500
Email: matt@mattsharplaw.com

*Attorneys for Plaintiff*

[*Additional Counsel Listed Below*]

## UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| OTILDA LAMONT, Derivatively on Behalf of CANNAVEST CORP., | Case No.: 2:15-cv-00481-RFB-VCF |
| Plaintiff, | |
| v. | **THIRD AMENDED SHAREHOLDER DERIVATIVE COMPLAINT** |
| MICHAEL MONA, JR., BART P. MACKAY, and LARRY RASKIN, | |
| Defendants, | |
| and | |
| CANNAVEST CORP., now known as CV Sciences, Inc. | |
| Nominal Defendant. | |

Plaintiff Otilda Lamont ("Plaintiff"), by and through her undersigned counsel, derivatively on behalf of Nominal Defendant CannaVest Corp., now known as CV Sciences, Inc. ("CannaVest" or the "Company"), submits this Third Amended Shareholder Derivative Complaint (the "Complaint"). Plaintiff's allegations are based upon her personal knowledge as to herself and her own acts, and upon information and belief, developed from the investigation and analysis by Plaintiff's counsel, including a review of publicly available information, including filings by CannaVest with the U.S. Securities and Exchange Commission ("SEC"), press releases, news reports, analyst

reports, investor conference transcripts, publicly available filings in lawsuits, and matters of public record.

## NATURE OF THE ACTION

1.     This is a shareholder derivative action brought in the right, and for the benefit, of CannaVest against certain of its officers and directors seeking to remedy the Individual Defendants' (as defined below) breach of fiduciary duties and gross mismanagement that occurred from May 20, 2013 through the present (the "Relevant Period") and have caused substantial harm to CannaVest.

## JURISDICTION

2.     This Court has jurisdiction over the claims asserted herein under 28 U.S.C. § 1332 because there is complete diversity among the parties and the amount in controversy exceeds the sum of $75,000, exclusive of interest and costs.

3.     Venue is proper in this Court because the Company maintains its executive office in this county, a substantial portion of the transactions and wrongs complained of herein occurred in this county, and the Individual Defendants have received substantial compensation in this county by doing business here and engaging in numerous activities that had an effect in this county.

## THE PARTIES

4.     ***Plaintiff Otilda Lamont*** ("Lamont") is, and was at relevant times, a shareholder of CannaVest.  Plaintiff Lamont will fairly and adequately represent the interests of the shareholders in enforcing the rights of the corporation.  Plaintiff Lamont is a resident of the State of New York.  Plaintiff Lamont first purchased the common stock of CV on February 24, 2014, she has held the common stock of CV continuously to the present date, she is a current holder of CV common stock, and it is her intention to continue to hold the common stock of CV until the conclusion of this matter.

5.     ***Nominal Defendant CannaVest*** manufactures, markets, and sells products containing industrial hemp-based compounds, including cannabidiol (CBD), one of the cannabinoids found in hemp.  CannaVest is incorporated in Delaware and

headquartered at 2688 South Rainbow Blvd., Suite B, Las Vegas, Nevada 89146. Further, because CannaVest is incorporated in Delaware, Delaware law applies.

6.      Article III of CannaVest's Certificate of Incorporation states: "The purpose of the Corporation is to engage in any lawful act or activity for which a corporation may be organized under the General Corporation Law of Delaware ("DGCL").

7.      ***Defendant Michael Mona, Jr.*** ("Mona") was, at all relevant times, the President, Chief Executive Officer ("CEO") and a Director of the Company.  Defendant Mona was appointed as President, Secretary and Treasurer of the Company on November 16, 2012, and as a Director on January 28, 2013.  Defendant Mona resigned as Secretary and Treasurer and was appointed CEO on July 25, 2013.  Defendant Mona is a resident of the State of Nevada.  Defendant Mona is also a member of Roen Ventures, LLC ("Roen Ventures").

8.      Before becoming President of CannaVest in November 2012, Mona, Jr. was associated with Medical Marijuana, Inc. A corporate brochure published by CannaVest states that "Mr. Mona worked as a consultant to Medical Marijuana Inc. until early 2013 when he was named President and CEO of CannaVest Corp." See also Thomas H. Clarke, "Hemp Oil Hustlers: Project CBD Investigates Makers of RSHO," The Daily Chronic at 12 and n.52 (Oct. 15, 2014) (citing SupplySide West 2014 expo list of speakers, Side West website).  During the Relevant Period, Mona, Jr. was a 4% owner of Medical Marijuana, Inc.

9.      According to the Company's SEC filings, "Mr. Mona possesses over 25 years of experience in the field of construction, investments and project development, holding various senior positions in these fields since 1987. Since 1994, Mr. Mona has served as the President of M&M Development, Inc. and in such role has overseen the construction and operation of various apartment projects, hotels and recreational vehicle parks throughout Las Vegas, Nevada." Mona, Jr.'s son, Michael Mona, III ("Mona III") was appointed Vice President of Operations at CannaVest on or about July 25, 2013.

Prior to joining the Company, Mona III was Vice President, Product Development for Medical Marijuana, Inc., and was responsible for the development and testing of hemp-based products.

10.     On November 16, 2012, non-parties Mai Dun Limited, LLC, Mercia Holdings, LLC, General Hemp, LLC and Bamburgh Holdings, LLC (the "Buyers"), acquired a total of 6,979,900 shares of the Company's common stock in a series of private transactions. Upon consummation of the transactions, the Buyers collectively acquired 99.7% of the Company's total issued and outstanding shares of common stock.

11.     ***Defendant Bart P. Mackay*** ("Mackay") has been a Director of the Company since March 14, 2013. As of May 31, 2013, Mackay beneficially owned 64.3% of CannaVest's common stock. As of March 28, 2014, MacKay owned 54.29% of the Company's common stock.

12.     Mackay, a member of the CannaVest Board, both individually and through Mackay Ventures LLC (formerly Mackay Ventures, Inc.), was during the Relevant Period the sole member of each of Mai Dun Limited, LLC and Mercia Holdings, LLC, which each own a 50% interest in Roen Ventures LLC ("Roen Ventures").

13.     As of June 27, 2014, Mackay Ventures, Inc. owned 1,100,000 shares of CannaVest's common stock.  Mercia Holdings, LLC and Mai Dun Limited, LLC are members of Roen Ventures. Defendant Mackay, the manager of Roen Ventures and Mai Dun Limited, LLC and the sole shareholder, officer and director of MacKay Ventures Inc., is deemed to have shared voting and investment power over the shares of CannaVest common stock owned by Roen Ventures, Mai Dun Limited, LLC and Mackay Ventures Inc.   Defendant Mackay is a member of the Compensation Committee.  Defendant Mackay is a resident of the State of Nevada.

14.     Mackay is an attorney licensed since 1984 with emphasis in corporate finance, technology and entrepreneurial legal matters. According to CannaVest's SEC filings, Mackay has extensive experience in establishing and developing new enterprises

both from management and operational aspects, including the formation and growth of several of his own ventures.

15.     ***Defendant Larry Raskin*** ("Raskin") was appointed a Director of the Company on May 7, 2014.  During the Relevant Period, Raskin was a member of the Compensation Committee.  Defendant Raskin is a resident of North Carolina.

16.     Mr. Raskin has been the Global Vice President of Leadership Development of ACN Inc., a telecommunications company, since 2012. Mr. Raskin joined ACN Inc. in 1994 and has held various positions in the company, including Vice President of Sales North America from 2001 to 2006 and Senior Vice President in 2012 prior to stepping into his current position. Prior to joining ACN Inc., Mr. Raskin was a National Marketing Director at National Safety Associates of Memphis, Tennessee from 1988 to 1994. According to CannaVest's SEC filings, Mr. Raskin's extensive business background made him a valuable addition to the Board.

17.     Defendants Mona, MacKay, and Raskin are collectively referred to hereinafter as the "Individual Defendants."

18.     According to CannaVest's SEC filings, other than the Compensation Committee, it did not have any other committees of the Board, including an Audit Committee or a Nominating Committee, or any other committees performing similar functions. According to CannaVest's SEC filings, the functions of those committees are being undertaken by the Board of Directors as a whole.

19.     CannaVest, Roen Ventures, and Mona Co. Development (an entity owned by Defendant Mona) all share the same address, the Wilson Building, located at 2688 S. Rainbow Blvd., Las Vegas, NV.

20.     ***Non-Party Stuart Titus*** ("Titus") is the CEO and controlling shareholder of Medical Marijuana, Inc. The financing for the acquisition of CannaVest, including the interest acquired by Mackay, was provided by Titus who received 7.1% of CannaVest's common shares. In the time period of January through March of 2014, Titus sold shares of CannaVest common stock he had acquired for a nickel at prices ranging from $40.76

per share to $166.17 per share, pocketing $7 million. Titus served as a consultant and advisor to CannaVest and was and is a holder of CannaVest common stock. For the year ended 2013 CannaVest disclosed that "[t]he Company paid a total of $30,000 to Mr. Stuart Titus, a stockholder of the Company, for consulting services provided."

21.   ***Non-Party Michael Llamas*** ("Llamas") was the former owner of Medical Marijuana, Inc. Llamas resigned from Medical Marijuana, Inc. after he was indicted for a $10 million mortgage fraud. Nevertheless, upon information and belief, throughout the Relevant Period Llamas continued to participate in the behind the scenes management of both Medical Marijuana, Inc. and CannaVest.  Mr. Llamas pled guilty to criminal charges in the action captioned *USA v. Llamas*, 2:12-cr-00315 (E.D. Calif) but died when he crashed his Lamborghini in a one car accident while awaiting sentencing.

## CODE OF BUSINESS CONDUCT AND ETHICS

22.   As members of the CannaVest Board of Directors (the "Board"), the Individual Defendants were held to the highest standards of honesty and integrity and charged with overseeing the Company's business practices and policies and of assuring the integrity of its financial and business records.

23.   The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of CannaVest, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its investors that the Individual Defendants were aware posed a risk of serious injury to the Company.

24.   As noted above, the Company does not have an Audit Committee or a Nominating Committee, or any other committee performing a similar function.  The functions of these committees are being undertaken by the Board as a whole.

25.   On June 16, 2014, a Compensation Committee was formed by approval of the Board.  The following directors are members of the Compensation Committee: Mackay and Raskin.

///

## DUTIES OF THE INDIVIDUAL DEFENDANTS

26.    By reason of their positions as officers and/or directors of the Company, and because of their ability to control the business and corporate affairs of CannaVest, the Individual Defendants owed CannaVest and its investors the fiduciary obligations of trust, loyalty, and good faith.  The obligations required the Individual Defendants to use their utmost abilities to control and manage CannaVest in an honest and lawful manner. The Individual Defendants were and are required to act in furtherance of the best interests of CannaVest and its investors.

27.    Each director of the Company owes to CannaVest and its investors the fiduciary duty to exercise loyalty, good faith, and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets.  In addition, as officers and/or directors of a publicly held company, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's operations, finances, and financial condition, as well as present and future business prospects, so that the market price of the Company's stock would be based on truthful and accurate information.

28.    To discharge their duties, the officers and directors of CannaVest were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls governing the affairs of the Company.  By virtue of such duties, the officers and directors of CannaVest were required to, among other things:

> (a)    ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;

> (b)    conduct the affairs of the Company in an efficient, businesslike manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's business prospects, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

(d)     remain informed as to how CannaVest conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiries in connection therewith, take steps to correct such conditions or practices, and make such disclosures as necessary to comply with federal and state securities laws;

(e)     ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable federal, state and local laws, and rules and regulations; and

(f)     ensure that all decisions were the product of independent business judgment and not the result of outside influences or entrenchment motives.

29.     Each Individual Defendant, by virtue of his position as a director and/or officer, owed to the Company and to its shareholders the fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.  The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of CannaVest, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware, or should have been aware, posed a risk of serious injury to the Company.

30.     The Individual Defendants breached their duties of loyalty and good faith by causing the Company to issue false and misleading statements concerning the financial condition of the Company.  As a result, CannaVest has expended, and will continue to expend, significant sums of money related to investigations and lawsuits.

**BACKGROUND**

31.     On April 16, 2012, a news article reported that CannaBank sold an 80% interest in PhytoSphere Systems ("PhytoSphere") to Medical Marijuana, Inc. ("MJNA") for $2.5 million (http://www.altassets.net/private-equity-news/by-news-type/deal-news/cannabank-sells-phytosphere-systems-to-medical-marijuana.html). This information was later confirmed in an article, "CannaBank Takes Hit Of $2.5M Sale", (http://blogs.wsj.com/privateequity/2012/04/13/cannabank-takes-hit-of-2-5m-sale/), which notes that Llamas, acting on behalf of MJNA as its President, purchased PhytoSphere for $2.5 million from CannaBank.

32.     On February 15, 2013, *Seeking Alpha* published an in-depth analysis of MJNA and the individuals at its helm. The analysis, "Chronically Criminal: Shielding The Public From Medical Marijuana" (http://seekingalpha.com/article/1187411-chronically-criminal-shielding-the-public-from-medical-marijuana) disclosed the following information regarding Llamas:

> According to multiple Medical Marijuana filings, Mr. Michael Llamas (age 28) has served as President and Director of the Company and also indirectly controls 48% of the Company through his beneficial ownership of Hemp Deposit and Distribution Corp. Also, according to multiple Medical Marijuana filings, Mr. Michael Llamas' sole prior business experience was founding North America Companies LLC, a real estate development and acquisitions firm specializing in distressed debt that completed "in excess of ten billion dollars in transactions." Notably absent from Medical Marijuana filings is any discussion of Mr. Michael Llamas prolific prior indictments for fraud and financial shenanigans.

> First, on 09/14/12, Mr. Michael Llamas was indicted by the United States for the Eastern District of California along with six other individuals for a case involving 19 counts of Mail Fraud and 31 counts of Wire Fraud related to a mortgage fraud scheme that caused more than $10mm in losses to mortgage lenders and others. According to the indictment, Mr. Michael Llamas would approach builders of new homes and developers of condominiums to purchase investment homes in bulk at substantial price discounts ranging from 30 to 50 percent off under the terms of an "option contract." Mr. Michael Llamas had no financial ability and no intention of purchasing the homes; rather, the homes were to be sold to an associate's nominee members at full price. Mr. Michael

Llamas then arranged for an affiliated mortgage company, Nationwide Lending Group (NLG), to sell mortgage loans for the nominees with banks and other lenders at the full price of the homes without disclosing the large price discount. Lenders were thereby misled into advancing loans that far exceeded their lending guidelines.  Also, the large option contract price discount was used to conceal the lack of required down payments by nominee buyers.  Mr. Michael Llamas then split what remained of the price discount after subtraction of the fake down payments and certain fees with his cronies.  In addition, Mr. Michael Llamas induced at least one home builder to record false liens in favor of one of their entities, Cobalt One LLC, for millions of dollars in bogus loans to cover up large payments from an associated firm to Cobalt One.  If convicted, the Mr. Michael Llamas and the other defendants face a maximum statutory penalty for each violation of mail and wire fraud of 20 years in prison, a $250,000 fine, and a three-year term of supervised release. As of 12/11/12, Mr. Michael Llamas has been released on bail pending trial.

On 09/17/12, just three days after being indicted by the Eastern District of California, Mr. Michael Llamas announced a "leave of absence effective immediately" from Medical Marijuana in order to "focus his attention on personal business matters." However, Mr. Michael Llamas signed off and certified the Medical Marijuana 09/30/12 Financial and Information Disclosure Statement as the Company's "President. This is one of many reasons why we believe the MJNA financials are fraudulent and most likely fabricated.

More interesting is the fact that on 09/30/12 and 12/02/12, Mr. Michael Llamas and Mr. Michael Corrigan, Esq. (MJNA's external counsel), respectively, certified that no members of the Company's management team had been subject to "a conviction in a criminal proceeding or named as a defendant in a pending criminal proceeding in the past five years." This appears to be a blatant fabrication in regards to Mr. Michael Llamas' prior court records. Moreover, this clearly violates the OTC Pink Basic Disclosure Guidelines Section 8B.1.

Next, on 12/05/07, Mr. Michael Llamas was sued by Mr. and Mrs. David Villar in the United States Bankruptcy Court for the Northern District of California for the Fraudulent Transfer of the couple's home in San Mateo California via a $830k purchase option agreement (Case No. 05-35167 TCLS) (Appendix E).  While the matter was eventually privately settled, it appears Mr. Michael Llamas was forced to pay restitution to the Villars.

Similarly, on 12/08/06, Mr. Michael Llamas (who was 22 at the time), was arrested by the Tracy, California police department on charges of forgery, grand theft, financial elder abuse and conspiracy. Specifically, Mr. Michael Llamas was accused of hoodwinking an elderly couple into believing they had negotiated a reverse mortgage based on the $485k equity value of their home, but instead transferred the title of the property to an entity Llamas controlled for de minimis consideration.

Mr. Michael Llamas seems to have engaged in such extensive mortgage fraud schemes against so many other unsuspecting victims that an anonymous blog was created in 2009 dedicated to tracking his activities. More information is available via: http://mikellamas.blogspot.ca/

In summary, based on Mr. Michael Llamas' exhaustive history of mail, wire, and mortgage fraud, it is inconceivable he could effectively serve as a President and Director of a $370mm publicly traded company. In this case, the reality of the situation is even worse as Mr. Michael Llamas is not only the President and Director of Medical Marijuana, Inc., but also the largest and controlling shareholder. We have good reason to believe that Mr. Michael Llamas is directly involved in the liquidation of the free trading shares and will cover this in more detail the next section.

*       *       *

In addition to all this, we discovered today that PhytoSphere (OTC: PHOT), a direct subsidiary of MJNA, paid $100K in cash to bail Michael Llamas from jail. This was never disclosed as it should have been in the 12/31 "Audit" and is yet another example of fraud perpetrated by MJNA.

33.    As noted above, Llamas purportedly left MJNA on September 17, 2012, after his indictment, but continued to unofficially run the company (and sign official company documents). Thereafter, Llamas' hand-picked President and CEO of CannaVest, Mona, followed in Llamas' footsteps.

34.    Information on the formation of CannaVest and the involvement of Defendant Mona, Defendant MacKay, Titus, Llamas can be found in an article published in Forbes on April 14, 2014 entitled, "Inside the Pot Stock Bubble," which provided in part:

///

11

When Michael Mona Jr. went before the Nevada Gaming Control Board seeking a license for his Mediterranean-style Sunrise Suites hotel and casino in Las Vegas, it didn't go well. The board, reportedly wary of his ties to shady telemarketers, including one who spent time in jail, told Mona his application would be rejected. He in turn withdrew his application and subsequently filed for personal bankruptcy when the casino could not open.

Mona might not be fit for the gambling business, but 16 years later he has found a lucrative field that's not as choosy: the pot penny stock business. Mona now runs CannaVest, the highest-flying stock in one of the year's biggest market frenzies. With Colorado and Washington now permitting the sale of marijuana for recreational use, and 20 states allowing it medically, some 60 publicly traded outfits, many snarled in a tangled, difficult-to-track web of interconnections, have popped up, claiming to be pot and hemp stocks. Almost none, mind you, emerged via an IPO and all the pesky disclosure and scrutiny that come with that path. Instead, real estate, marketing and oil outfits have miraculously morphed into medical marijuana and hemp companies, either through reverse mergers or simply changing their declared line of business. And just about every single one is thinly traded on the over-the-counter bulletin board, or Pink Sheets, where promoters can push them with the enthusiasm of a campus dealer.

\*\*\*

The genesis of CannaVest–and the pot-stock frenzy overall–can be traced to Bruce Perlowin. He knows the business well: He spent nine years in prison for drug smuggling. With another ex-con, Don Steinberg (who also went to jail for drug smuggling), Perlowin started the first publicly traded medical marijuana company in 2009. He got the idea after a CNBC documentary called Marijuana Inc. featured Perlowin's drug-smuggling past. After it aired Perlowin was bombarded with calls and investment proposals.

Perlowin and Steinberg already controlled a company that sold debit cards and traded on the Pink Sheets, Club Vivanet. "Is there any sizzle in debit cards?" Perlowin asks FORBES rhetorically. "There was so much sizzle in medical marijuana." To remove any nuance he renamed his company Medical Marijuana and was issued 40 million shares by the board.

What followed has been a textbook example of how to create buzz through wheeling and dealing with related vehicles. When Perlowin oversaw it, Medical Marijuana didn't actually do much, offering educational seminars and consulting services. **Then, in 2011, Medical Marijuana sold a huge stake by issuing 260 million shares to a privately held investment vehicle, Hemp Deposit & Distribution Corp., run by Michael Llamas, then 26.**

**Llamas became Medical Marijuana's president. Assets began moving back and forth between the companies he ran, creating at least the appearance of progress. For instance, in April 2012 Medical Marijuana acquired 80% of a Hemp Deposit business called PhytoSphere, which was billed by Llamas in a press release as a biotech outfit that produces hemp-based products for pharmaceutical markets.**

12

Llamas also created a joint venture for Medical Marijuana with Dixie Elixirs & Edibles, a Colorado-regulated manufacturer of medical-marijuana-infused products. Vincent "Tripp" Keber, the man behind Dixie Elixirs, hopped on Medical Marijuana's board and soon appeared on 60 Minutes as the darling poster boy of the "green rush" going on in Colorado. (Keber would be arrested for marijuana possession in Alabama in 2013.) *Frustrated casino developer Mona quickly joined the gang at Medical Marijuana, taking a stake in the company and sitting on the management committee overseeing the Dixie joint venture*.

Medical Marijuana's stock price shot from 3 cents to 20 cents. But the party stalled in September 2012 after a federal grand jury indicted Llamas as part of an alleged $10 million mortgage fraud. Llamas pleaded not guilty but resigned from Medical Marijuana–just as the SEC started investigating it.

Time to start fresh. *Within a few weeks Mona left Medical Marijuana to become CEO of CannaVest, a new company that Mackay, the paper billionaire, created by using companies he owned to buy control of a penny stock company in the foreclosure business. New name, same game. Mackay's share purchases were financed by a Florida physiotherapist named Stuart Titus, who–surprise!–had helped Perlowin raise capital for Medical Marijuana. Titus also backs a hemp multilevel marketing company.*

*Titus put $375,000 behind Mackay's CannaVest play and also got millions of CannaVest's shares. CannaVest then agreed to buy the assets of PhytoSphere from Medical Marijuana and Llamas' Hemp Deposit for $35 million in cash or stock. Follow all this? Few people can–a fact that Mona himself apparently alluded to. "Your reference to this being a 'shell game' is offensive," a Dixie Elixirs executive wrote to Mona last year in an e-mail obtained by FORBES. "I request you not say it again."*

Shell game. Three-card monte. Or just a flurry of dealmaking between related companies that happen to be publicly traded. Whatever you call it, CannaVest's shares were poised to take off–and the architects stood ready for a great windfall.

\*\*\*

The one thing that isn't murky here: the fortunes being made by those at CannaVest.

Of course, there's Mackay. Even with the stock at $68, he's recently been able to convert loans into 10 million shares–at 60 cents each. That 100-fold arbitrage is the large driver of his "billionaire" status. His pals Mona, the CannaVest CEO, and Llamas, the kid who ran its forerunner before he was indicted, helped him pull it off.

Here's how: Last year an entity called Roen Ventures agreed to lend $6 million to CannaVest. According to a recent lawsuit against Mona in

13

Nevada, filed as part of a $17.8 million judgment related to a land transaction, Mona and Llamas had formed Roen. According to the lawsuit, Mona had personally put up half that loan–and then sold his interest in Roen to Mackay for $500,000. Mackay acknowledges buying out Llamas. And then he converted Roen Ventures' loans to 10 million shares of CannaVest stock at 60 cents a share. Voil?! More than $1 billion at the recent share price, when you include all the shares he owns.

***Another winner: Titus, the physiotherapist down in Florida, who had bankrolled Mackay at CannaVest–and worked to finance Medical Marijuana before that. This year he's been turning his paper profits into actual cash, taking CannaVest shares he had bought for a nickel each and selling them for as much as $150 a share, and pocketing $7 million, an SEC filing shows. "I have to say that, you know, this has turned out quite nicely," Titus tells FORBES in an interview.*** Meantime, Mona's son owns 1.25 million shares.

(Emphasis added).

35.     A more detailed history of CannaVest and its connection with Medical Marijuana, Inc. and the other players involved in Defendants' breach of fiduciary duties is told in an expose authored by Project CBD[1] and published by the Daily Chronic on October 15, 2014. Thomas H. Clarke, "Hemp Oil Hustlers: Project CBD Investigates Makers of RSHO," The Daily Chronic (Oct. 15, 2014). A large part of the expose focuses on the potentially contaminated and unsafe products these companies were/are manufacturing and/or peddling, the substance of which will not be recounted here. The well-sourced expose provides in part:

In 2011, Michael Llamas purchased majority ownership in Medical Marijuana Inc. through another firm he controlled, the Hemp Deposit and Distribution Corporation. Stock market analysts would soon raise questions about Medical Marijuana Inc.'s new, young owner, who had a shoddy financial history involving complex mortgage fraud, according to federal investigators. [*Id.* at 9]

***

***Soon after Llamas was indicted [in September 2012] for mortgage fraud, Medical Marijuana Inc. announced that he had resigned as interim president and CEO. But he continued to be a major shareholder in the company. With Llamas calling the shots from behind the scenes, Medical***

---

[1]     According to its website, Project CBD is a California-based nonprofit dedicated to promoting and publicizing research into the medical uses of cannabidiol (CBD) and other components of the cannabis plant. It purports to provide educational services for physicians, patients, industry professionals, and the general public.

*Marijuana Inc. would morph into a high-profile umbrella corporation with significant holdings in at least seven different subsidiaries, each at varying levels of capitalization. [Id.]*

\*\*\*

An umbrella corporation like Medical Marijuana Inc., with a complicated network of portfolio companies, can impress outsiders the same way a frill-necked lizard wards off predators: by making itself seem bigger (and thus more credible) than it actually is. MJNA stitched together a network of subsidiaries and affiliates, which grew to include HempMeds PX, Red Dice Holdings, Dixie Botanicals, PhytoSphere Systems, Kannaway, CanChew BioTechnologies, Canpia Holdings, Ace Hydro, KannaLife Sciences, and Wellness Managed Services. [*Id.* at 10]

Medical Marijuana Inc. often cited these entities as sources of revenue, but some of them appear to be illusory. For example, MJNA asserted in a press release that its collection of health and wellness facilities operated by Wellness Managed Services experienced "an accumulative 3941% revenue increase" throughout 2011, but it's hard to figure out exactly how that happened. The website for Wellness Managed Services contains distorted stock photos and typos on the "About" page and appears not to have been updated in two years. Phone calls to Wellness Managed Services by Project CBD were routed back to Medical Marijuana Inc.'s line, which never returned our messages.‡ [*Id.*]

\*\*\*

The complex enmeshing of "shell companies"— companies that act as vehicles for business transactions without actually having any assets or operations themselves—is another hallmark of pump and dump schemes, says Seattle-based Canna Law attorney Robert McVay. [*Id.* at 11]

"Novice investors will see the complicated structures and holding companies that have a bunch of shell companies attached to them, and [then] people put trust in these companies because they seem large and professional," McVay told Project CBD. [*Id.*]

Corporate start-ups can also bolster their legitimacy—or shroud their stock market schemes—by entering into strategic relationships with affiliate firms whose public image is mutually enhanced by the partnership. Companies reference each other in their press releases, McVay explained, "and they're able to pump each other up in terms of how they're doing. You see it a lot when a company is involved in fraudulent action." [*Id.*]

**CannaVest and PhytoSphere**
Medical Marijuana Inc. went into damage control mode in September 2012 when its interim CEO Michael Llamas was indicted for mortgage fraud. A MJNA press release quickly announced that he was stepping "down from his position in order to focus his attention on personal business matters that are entirely unrelated to MJNA." [*Id.* at 12]

15

*A few months later, Michael Mona Jr. left his post as Management Committee Chairman of Red Dice Holdings, a MJNA subsidiary, to launch a new company called CannaVest. A corporate brochure published by CannaVest states that "Mr. Mona worked as a consultant to Medical Marijuana Inc. until early 2013 when he was named President and CEO of CannaVest Corp."* [*Id.*]

*From January 2013 onward, CannaVest and Medical Marijuana Inc. not only pumped each other up in their press releases, they also formed a production and distribution line for CBD-infused "hemp oil" imports that bound the two together like the intestinal tract of conjoined twins. And they regularly exchanged shares with each other, lending an appearance of growth and productivity to outsiders.* [*Id.*]

The corporate headquarters of CannaVest is located on Rainbow Avenue in Las Vegas, Nevada, in the same Sin City suite that was also home base for a company called Roen Ventures. Co-founded by Mona and Llamas, Roen Ventures was hit with a $17.77 million legal judgment in 2012 for facilitating fraudulent land transactions in California. [*Id.*][2]

Before January 2013, CannaVest was known as Foreclosure Solutions, where Mona served as President and CEO. In order for Foreclosure to transition into CannaVest, some of Mona's associates in other industries began buying CannaVest shares. Mona also funneled a $3 million loan through Roen Ventures to CannaVest, a maneuver that rankled Far West Industries, the creditor that had won the $17.77 million settlement against Roen Ventures. Far West Industries said that loan "was intended to

---

[2]     According to CannaVest's Form 10-K for the year ended December 31, 2013 filed with the SEC on March 28, 2014:

"On March 8, 2008, Far West Industries ("Far West") sued Michael J. Mona, Jr., President and Chief Executive Officer of the Company, and others for damages resulting from fraud arising out of a land transaction in California. On February 23, 2012, a judgment was entered in the California Action in favor of Far West against Mr. Mona and others in the amount of $17,777,562.18. On October 18, 2012, the judgment in the California action was domesticated in Nevada and enforcement proceedings commenced including, but not limited to an examination of Mr. Mona as a judgment debtor, and garnishments of various accounts belonging to Mr. Mona. During the period, Mr. Mona loaned $3,000,000 to Roen Ventures, LLC, which was subsequently loaned to the Company. The suit alleges that the transaction was intended to prejudice creditors like Far West by concealing and wasting assets that would otherwise be available to satisfy the judgment that Far West has against Mr. Mona. Pursuant to a Second Amended Complaint filed by Far West Industries on February 20, 2014, the Company was added as a defendant to the suit. On March 17, 2014, the Company was served with the Second Amended Complaint. In summary, Far West alleges that the Company is in possession of funds as a result of an allegedly fraudulent transfer between Michael Mona, Jr., Roen Ventures, LLC, and the Company. Management plans to defend the claims to the fullest extent of the law. No determination has been made as the merit of the case or potential outcome." Thereafter the Company was dismissed from the action.

16

prejudice creditors like Far West by concealing and wasting assets that would otherwise be available to satisfy the [$17.7 million] judgment." [*Id.*]

But no matter. It was a new year, and Mona and his partner Llamas, the disgraced majority shareholder of Medical Marijuana Inc., had positioned themselves at the top of a nascent industry where investors were clamoring to get a piece of the action. Voters in Colorado and Washington had recently cast their ballots for legal recreational cannabis and the value of any stock even tenuously connected to ganja went soaring.

***In a glowing press release dated March 1, 2013, Medical Marijuana Inc. announced that it was selling its subsidiary PhytoSphere (which processed the hemp paste from abroad) to CannaVest for $35 million in "CANV" shares. It sounded impressive on paper, but CannaVest scarcely had an operation to justify any meaningful valuation of its shares. SEC filings show that CannaVest only had a total of $431 in assets at the time the transaction was announced.*** [*Id.* at 12-13]

"The terms of the transaction were the result of arms-length negotiations between the parties, unaffected by any prior relationships," explained Michael J. Mona, III, VP of Operations for CannaVest (the CEO's son). [*Id.*]

Throughout 2013, Medical Marijuana Inc. reported that it was handing off incremental parts of its portfolio company PhytoSphere to CannaVest for piecemeal infusions of $35 million in CannaVest shares. Each new pronouncement gave a momentary jolt to the price of Medical Marijuana Inc. shares, their value inflated by overblown press releases and a cannabis-crazy zeitgeist. [Id.]

"Medical Marijuana Inc. has never sold a single share of CannaVest, so it's done no good for the company," said Alan Brochstein, founder of 420 Investor, in a phone conversation with Project CBD. Brochstein is cautious about labeling the MJNA-CANV collaboration a "fraud," but he acknowledges that the whole thing is suspect. [*Id.*]

***"They put an arbitrary price of $35 million, and said it was all going to be paid in [CannaVest] stock and not cash. But [CannaVest] was a shell company that had no operation, so the whole thing looks fraudulent," he said. "How did they come to $35 million?"*** [*Id.*]

Brochstein isn't the only investment analyst who has challenged the financials of weed start-ups like Medical Marijuana Inc. "Most of these over-the-counter weed penny stocks are just vehicles for their insiders to sell shares to retail investors caught up in the hype of the legalized marijuana revolution," wrote Cody Willard in the Wall Street Journal MarketWatch blog. [*Id.*]

***Insiders at CannaVest and Medical Marijuana Inc. held much of each other's shares, and some would later sell them to credulous traders at a significant markup.*** [*Id.*]

17

*For example, Stuart Titus, the owner of Kannaway's parent company, General Hemp, and a key financier for Medical Marijuana Inc., sold over $4 million worth of CANV shares in early 2014 as their value reached an astronomical $166.17 each. The rise and fall of CANV's price trajectory looks like the Burj Khalifa skyscraper shooting up from the streets of Dubai.* [*Id.*]

*One reason why CANV shares spiked so high is that Medical Marijuana Inc. sold PhytoSphere "assets" to CannaVest for $35 million (almost exclusively) in CANV shares, a transaction that bolstered both companies' profiles at little actual cost. CannaVest also issued 900,000 of its shares to PhytoSphere as part of that deal. The whole transaction was somewhat like the episode of Beavis and Butthead in which the two teenagers sell all their chocolate bars to each other for the same pair of dollars.* [*Id.* at 13-14]

*The mega-valuation of CANV shares may have temporarily boosted MJNA's valuation because of "a weird feedback loop" created by Medical Marijuana Inc., writes a representative of Rolling O Research on the investor website Seeking Alpha. "[Medical Marijuana Inc.] mentions . . . CannaVest in their PR. Some readers then think that CannaVest sold much more product than it likely did, which increases the price of CANV shares. That increases the value of MJNA's CannaVest holdings on the balance sheet, providing support to a higher [MJNA] stock price."* [*Id.* at 14]

*MJNA stock peaked at about 50 cents, but since then its price has hovered below 20 cents per share. By October 2014, CANV shares had dropped precipitously to $3.00, a change facilitated by a barrage of bad press. An article in Forbes, "Inside the Pot Stock Bubble" (March 26, 2014), disclosed that CEO Mona was attempting to sell 10 million CANV shares for $1.50 each. These restricted shares couldn't be traded publicly for another six months. When queried about this deal, Michael Mona III of CannaVest told Project CBD that this offering had been terminated on April 23.* [*Id.* at 14]

On May 9, purchasers of CANV stock filed a class action lawsuit against CannaVest. The lawsuit followed a disclosure by CannaVest to the SEC that it had "misreported" its financial position throughout 2013. [*Id.*]

***

In July 2014, a Project CBD delegation visited the laboratory facilities of CannaVest in San Diego, where the imported hemp paste is refined into oil. We were greeted by lab director Joshua Hartsel and CannaVest executives Chris Boucher and Michael Mona III. [*Id.* at 27]

Hartsel, the lead scientist at CannaVest, specializes in medicinal organic chemistry. He earned a PhD at Virginia Tech and completed a postdoctoral fellowship at the University of California. He subsequently founded Delta-9 Technologies, an analytical testing lab that serviced California's medical marijuana industry. Hartsel's clients included CannaVest, which sent the first of several batches of its CBD-infused extract to Delta-9 Technologies for evaluation in March 2013. [*Id.*]

18

A half year later, Hartsel was hired by CannaVest to establish an in-house laboratory and oversee research and development for the company. ***Hartsel got the job after being interviewed by CannaVest CEO Michael Mona Jr. and Michael Llamas, the former CEO of Medical Marijuana Inc.*** [*Id.*]

Prior to September 2013, CannaVest did not have a science department, according to Hartsel. But CannaVest, through its subsidiary PhytoSphere, had been providing CBD-infused hemp oil to Medical Marijuana Inc. for several months before Hartsel came on board. [Id.]

***The exact role of PhytoSphere in the hemp oil pipeline remains somewhat of an enigma. Originally a wholly owned subsidiary of Medical Marijuana Inc., PhytoSphere was supposedly sold to CannaVest in exchange for $35 million in CANV shares. But CannaVest insiders told Project CBD that Medical Marijuana Inc. never fully dissolved its portion of PhytoSphere. "At one point, we had a PhytoSphere and they had a PhytoSphere," said Michael Mona.*** [*Id.*]

To allay confusion as to the status of Phytosphere—and perhaps also to distance itself from any problems that may have arisen prior to forming an in-house science team—CannaVest changed the name of Phytosphere to CannaVest Laboratories, LLC. [Id.]

\*\*\*

***When Project CBD visited CannaVest, we heard complaints about the Kannaway campaign and Michael Llamas's mercurial, behind-the-scenes management style.*** "We're separate, but everyone thinks we're one," CannaVest CEO Michael Mona Jr. insisted. "HempMeds is not CannaVest, and CannaVest is not HempMeds." [*Id*. at 29]

But even as it tried to distance itself from Medical Marijuana Inc., CannaVest was burdened by its own corporate history. In June 2014, CannaVest, a MJNA offshoot, announced that it had disposed of several million shares of KannaLife Sciences, a MJNA subsidiary, in exchange for a half million shares of CANV, which had previously been issued to Phytosphere. Shades of Beavis and Butthead again. [*Id.*]

(Emphasis added).

36.     The above events were perpetrated by Defendants, particularly Mona, Jr. and MacKay, and upon information and belief, these events also included non-parties Llamas and Titus.

## FACTS

37.     According to the Company's SEC filings, CannaVest is engaged in the business of developing, producing, marketing and selling end consumer products to the nutriceutical industry containing hemp plant extract, cannabidoil (CBD) and reselling to

19

third parties raw product acquired by the Company pursuant to its supply relationships in Europe. According to the Company, CannaVest seeks to take advantage of an emerging worldwide trend to re-energize the production of industrial hemp and to foster its many uses for consumers. CBD is derived from hemp stalk and seed. According to the Company, this legal substance can be used with foods and nutritional supplements for consumer health and wellness benefits as well as in the pharmaceutical industry.

38.     CannaVest (formerly Foreclosure Solutions, Inc.) was incorporated on December 9, 2010, in the state of Texas, to provide information on pre-foreclosure and foreclosed residential properties to homebuyers and real estate professionals on its website. The Company was unable to secure financing for this business plan and consequently experienced a change of control and a change of focus to its present business.

39.     According to the Company's SEC disclosures (see Form 10-K for the year ended 2013): On November 16, 2012, the Buyers (Mai Dun Limited, LLC, and Mercia Holdings, LLC (MacKay-owned entities), General Hemp, LLC and Bamburgh Holdings, LLC) (Titus-owned entities) acquired a total of 5,000,000 shares of common stock of the Company (formerly known as Foreclosure Solutions, Inc.) from H.J. Cole, the Company's former sole director and former sole officer ("Cole"). Concurrently, the Buyers acquired a total of 1,979,900 shares of common stock of the Company from other shareholders of the Company in a series of private transactions (the "Non-Affiliate Purchase Transactions"). The Buyers purchased all of the 6,979,900 shares in the Cole Purchase Transaction and the Non-Affiliate Purchase Transactions for an aggregate purchase price of $375,000. Upon consummation of the transactions described above, the Buyers collectively acquired 99.7% of the total issued and outstanding shares of common stock of the Company. The funds used for these share purchases were cash loaned to each of the Buyers from Titus pursuant to the terms of individual promissory notes entered into by Titus and the sole member of each of the Buyers. Defendant Mackay, a member of CannaVest's Board, is the sole member of each of Mai Dun

Limited, LLC and Mercia Holdings, LLC. Titus was the sole member of General Hemp LLC and was also deemed to have shared voting and investment power over the shares of CannaVest common stock owned by Bamburgh Holdings LLC.

40.    On January 29, 2013, following the change of control, the Company amended its certificate of formation to change its name to CannaVest.

41.    Also on January 29, 2013, CannaVest closed the asset acquisition transaction with PhytoSphere, at which time the Company took delivery of the acquired assets and made its first installment payment to PhtyoSphere by issuing 900,000 shares of common stock. CannaVest reported the value of the transaction at $35 million.

42.    On February 12, 2013, CannaVest announced its acquisition of the PhytoSphere assets:

**A.    Acquisition of Certain Assets of PhytoSphere Systems, LLC**

On December 31, 2012, we entered into an Agreement for Purchase and Sale of Assets (the "Purchase Agreement") with PhytoSPHERE Systems, LLC, a Delaware limited liability company ("PhytoSPHERE"), whereby the Company acquired certain assets of PhytoSPHERE in exchange for an aggregate payment of $35,000,000, payable in five (5) installments of either cash or common stock of the Company, in the sole discretion of the Company. Pursuant to the Agreement, the Company acquired from PhytoSPHERE certain tangible assets, including equipment and inventory, all web domains of PhytoSPHERE, existing bank accounts with a total balance of $50,774.55, phone numbers, e-mail addresses and postal addresses, vendor lists, permits, licenses and other approvals, and all existing and pending contracts. Notably, pursuant to the Purchase Agreement we acquired from PhytoSPHERE all of its rights, and assumed all of its liabilities, under contracts with hemp production and processing facilities in three foreign countries in Europe, which allows us to secure raw product for the development and production of products. We also secured the exclusive license to the name "PhytoSPHERE" and "PhytoSPHERE Systems" for use in the development and commercialization of hemp-based products.

The Purchase Agreement requires payment as follows: (a) $4,500,000 on or before January 31, 2013; (b) $6,000,000 on or before March 30, 2013; (c) $8,000,000 on or before June 30, 2013; (d) $10,000,000 on or before September 30, 2013; and $6,500,000 on or before December 31, 2013. For any installments paid by the issuance of stock, the number of shares of stock issuable by the Company is determined by reference [to] the closing price of our common stock on the day prior to issuance. The price is subject to a "collar", whereby in no event will the shares issuable pursuant to the Purchase Agreement be priced at more than $6.00 per share, and in no event will the shares be priced at less than $4.50 per share.

PhytoSPHERE is a Delaware limited liability company owned by Medical Marijuana, Inc. (MJNA.PK), an Oregon corporation, and Hemp Deposit and Distribution Corporation, a Delaware corporation. Our Chief Executive Officer and sole member of our Board of Directors, Michael Mona, Jr., owns and/or controls approximately 37,337,000 shares of common stock of Medical Marijuana, Inc., which represents approximately 4% of the issued and outstanding shares of the capital stock of Medical Marijuana, Inc. as of February 11, 2013. Mr. Mona does not hold any management position with Medical Marijuana, Inc. or serve on its board of directors, nor has he held any such position previously. Mr. Mona neither owns shares in, nor serves Hemp Deposit and Distribution Corporation in any capacity, nor has he done so previously.

43.     Just a few months earlier, Medical Marijuana, Inc. had acquired PhytoSphere for only a fraction of the price paid to Medical Marijuana, Inc. by CannaVest. In particular, an April 16, 2012 news article published by Altassets reported that CannaBank sold an 80% interest in PhytoSphere to MJNA for $2.5 million. See http://www.altassets.net/private-equity-news/by-news-type/deal-news/cannabank-sell-phytosphere-systems-to-medical-marijuana.html.  This information was also reported in an article, "CannaBank Takes Hit Of $2.5M Sale," published in the Wall Street Journal on April 13, 2012. In short, MJNA acquired an interest in PhytoSphere in April 2012 for $2.5 million, and eight months later agreed to sell this interest to CannaVest (which came into existence November 16, 2012) for purportedly $35 million.

44.     Throughout the Relevant Period, MJNA and its various subsidiaries issued a multitude of press releases touting their success and referencing their relationship with CannaVest. Specifically, MJNA touted the plans and accomplishments of CannaVest and PhytoSphere—an entity that both CannaVest and Medical Marijuana, Inc. at one time or another claimed as their own entity.

45.     On March 14, 2013, CannaVest increased the size of its Board of Directors from one (1) person (Mona) to four (4) persons, and appointed Defendant Mackay, and non-parties Sobieski and Wilson to fill the newly created seats and serve as directors of the Company, effective March 15, 2013.

46.     Then, on April 4, 2013, Medical Marijuana, Inc. issued a press release discussing the PhytoSphere transaction and prospects for PhytoSphere:

22

MEDICAL MARIJUANA INC ("MJNA") - Significant Revenue and Net Income Growth

PhytoSphere Systems LLC - is the world/s leading cannabinoid based bio-technology Company. The company recently entered into an agreement with CannaVest Corp (OTC:CANV) for the rights to use its brand name PhytoSphere Systems, along with the outsourcing to CannaVest its hemp facility cultivation, management and processing. The company is still owned eighty (80%) percent by Medical Marijuana Inc., and as part of the transaction MJNA became a significant shareholder in CANV.

PhytoSphere Systems will still play a significant role in the company's overall game plan, with the licensing and outsourcing to CannaVest, the company is able to save nearly ten (10M) million dollars of additional infrastructure and development costs in the first two quarts of this year alone. In addition to saving a significant amount of capital, the company was able to streamline its corporate operations by not having its focus diverted by a multi-country multi-continent highly management intensive business, while still allowing MJNA and its subsidiaries a constant supply of these high quality ingredients, just above manufacturing and infrastructure costs and well below wholesale and retail pricing.

As the demand for CBD-based products continues to grow, PhytoSphere is constantly expending their operational capacity to meet this demand. Internally, the company is expected to deliver several hundred kilograms of raw Hemp CBD oil this quarter to Medical Marijuana Inc. and the family of companies.

PhytoSphere will offer its raw materials to the open market starting May 1st 2013. With this raw materials sales launch, the company will launch its updated corporate information and sales sites, where customers can purchase a variety of products with several financing options for large scale wholesale accounts.

47.     As reported by CannaVest in its SEC filings, as of April 12, 2013, CannaVest had five employees; as of March 28, 2014, CannaVest had eight full-time employees and no part-time employees.

48.     According to CannaVest's SEC filings, the Company purchased the assets of PhytoSphere as the basis for implementing the Company's new business model, which was and is to manufacture, market and sell products containing hemp oil. According to announcements made by the Company at least as early as February 13, 2013, CannaVest anticipated launching its first product to large commercial buyers as early as March 2013, and having products on the market available to consumers shortly thereafter; and, CannaVest's "line of products [was] expected to grow throughout the

year – by year end 2013 we anticipate a full line of CBD and hemp-related consumer products."

49.     In sum, MJNA acquired an interest in PhytoSphere during April 2012 for $2.5 million, and eight months later agreed to sell this interest to CannaVest (which came into existence November 16, 2012) for $35 million.

50.     According to an April 14, 2014 *Forbes* article, Mona referred to this as a "shell game."  The article further noted:

> Shell game.  Three-card monte.  Or just a flurry of deal making between related companies that happen to be publicly traded.  Whatever you call it, CannaVest's shares were poised to take off–and the architects stood ready for a great windfall.

51.     CannaVest at that time was a small company with little to no money or business operations and was run by Mona (an MJNA insider).  It had the option of paying for all or portions of the $35 million in CannaVest stock, thus was a virtual certainty that CannaVest would pay MJNA with CannaVest stock.  Also, because CannaVest had only 7,900,000 common shares outstanding, the initial $4.5 million payment in CannaVest shares with an assigned value of $5.00 per share represented a return of 11.4% of CannaVest's outstanding shares to MJNA.  If MJNA were to be paid the entire $35 million with stock at a share value of $5 per share, it would have 7,000,000 shares which would represent an 88.6% ownership interest in the company thus making CannaVest an MJNA subsidiary.  And in fact, MJNA would have a controlling stock ownership interest in CannaVest long before CannaVest made its last payment.

52.     In substance, MJNA (Llamas' alter ego) orchestrated the appearance of a newly created publicly held company with $35 million of assets when in fact this number was grossly inflated, and when the new publicly held company was pre-arranged to be owned and controlled by MJNA (Llamas).  The recordation of the vastly overstated asset infusion also immediately increased the perceived worth of CannaVest's common stock to the investment community, thereby grossly inflating CannaVest's trading price.

On April 30, 2013, Medical Marijuana, Inc. issued another press release commenting on the PhytoSphere transaction:

> To The Shareholders of Medical Marijuana Inc.:
>
> From: Michelle Sides, Chairman, Chief Operating Officer and Shareholder
>
> -- FINANCIALS AND PHYTOSPHERE SYSTEMS TRANSACTION
> There have been some questions with regards to the CannaVEST transaction with Phytosphere Systems. The current status of this transaction is as follows: MJNA currently owns and has owned 80% of Phytosphere Systems, which is a global phytocannabinoid biotechnology company specializing in the production of hemp based compounds, oils and extracts. These include Cannabidiol (CBD), Cannabidiol-Acid (CBD-A), Cannabigerol (CBG) and Cannabigerol-Acid (CBG-A) as well as other beneficial cannabinoinds, terpenoids and flavinoids. The Phytosphere Systems is also developing a pipeline of Terpenoids and flavinoids. As part of the company's refocusing of management, time and capital, we decided to streamline our business focus.
>
> ***Prior to Phytosphere, these pipelines of products did not exist in any large quantity or steady supply. Since then, we have been able to sign an exclusive license with CannaVest Corp, which would allow MJNA the benefit of its steady pipeline, while no longer having to deal with the day to day operating challenges.*** The company operates in five countries and three continents. Along with the licensing agreement, the Company agreed to sell its excess inventory as well as the contracts, subcontractors and production capabilities to CannaVest as part of the transaction. This again allows the Company to no longer have to deal with the day to day operations, legal, export, import, licensing, continued development, considerable financial investments, staffing and costs associated with the logistics of the business while still owning 80% of Phytosphere. CannaVest provides the raw ingredients to the Company for the same price MJNA received prior to the execution of the license agreement. Once Phytospheres' production increases and creates a decrease in the cost of production, a drastic price reduction will be made available to MJNA and its subsidiaries.
>
> This obviously will lead to significantly increased profitability for MJNA and its shareholders. The payment structure is as follows:
>
> CannaVest is paying MJNA $35 million through the end of 2013. The payments can be made in stock or cash, or a combination of both (please look at legal disclosure for exact terms). If CannaVest pays in stock, MJNA becomes the majority shareholder in CannaVest and gets to realize a cost savings in production, while also the increase in value it may get from the continued growth of the brand. If CannaVest pays in cash, MJNA realizes a substantial increase in its cash position. To date MJNA received in the 4th quarter a $4.5m dollar payment in CannaVest stock payment towards its licensing obligation, and as disclosed in subsequent filings, the

25

Company has also received $4.5m and a $1.5m payment in stock from CannaVest, for a total stock payment of $10.5m towards licensing and partial inventory. The first payment of $4.5mil was 100% credited as licensing, the second and third installments are credited as an inventory purchase. The details of the transaction will be addressed in our first quarter filings, on or before May 15, 2013. The balance of the $24.5m payments ¼ consideration will be broken up between inventory purchases first, then against the production contracts and the agricultural production team that was acquired by CannaVest as part of the transaction.

53.     On May 14, 2013—one week before the Company filed with the SEC its financial statements for the first quarter 2013—CannaVest announced in a Form 8-K filed with the SEC that it had terminated its independent auditor Turner Stone & Company, LLP ("Turner Stone") and had replaced it with Anton Chia, LLP. Submitted in connection with the May 14, 2013 Form 8-K filing was a letter from Turner & Stone to Defendant Mona, Jr. and the Company. The letter *identified a significant material weakness in CannaVest's control over financial reporting:*

In connection with our recent audit of the financial statements of CannaVEST Corp. (the Company) as of December 31, 2012 and for the year then ended, in accordance with auditing standards promulgated by the Public Company Accounting Oversight Board (United States) (PCAOB), we considered the Company's internal control over financial reporting ("internal control") as a basis for designing our auditing procedures for the purpose of expressing our opinion on the financial statements, but not for the purpose of expressing an opinion on the effectiveness of the Company's internal control.

Our consideration of internal control was for the limited purpose described in the preceding paragraph and would not necessarily identify all deficiencies in internal control that might be significant deficiencies or material weaknesses and therefore, there can be no assurance that all deficiencies, significant deficiencies, or material weaknesses have been identified. However, as discussed below, *we identified a deficiency in the Company's internal control that we consider to be a significant deficiency and material weakness.*

A deficiency in internal control exists when the design or operation of a control does not allow management or employees, in the normal course of performing their assigned functions, to prevent, or detect and correct misstatements on a timely basis. A significant deficiency is a deficiency, or a combination of deficiencies, in internal control that is less severe than a material weakness, yet important enough to merit attention by those charged with governance. *A material weakness is a deficiency, or a combination of deficiencies, in internal control, such that there is a reasonable possibility that a material misstatement of the entity's financial statements will not be prevented, or detected and corrected on a timely basis.*

26

*The Company's accounting management, both former and current, consists of one person holding the offices of Chief Executive Officer and Chief Financial Officer. The general ledger accounting and financial statement preparation functions have been outsourced to independent accounting and/or consulting firms due to the lack of technical accounting qualifications and SEC reporting and disclosure experience by accounting management. In addition, after the change of control and accounting management, the independent accounting firm to which the accounting and financial statement preparation functions were contracted also did not have the technical accounting qualifications or experience with SEC reporting and disclosure matters.* As a result, the financial statements initially submitted to our firm to audit were missing a significant transaction and many disclosures required by generally accepted accounting principles. Accordingly, additional time was spent by your independent accounting firm preparing your financial statements and by our firm in reviewing them. *We recommend that accounting management discuss this matter with your independent accounting firm to determine if they are able to provide services that will allow you to remediate this material weakness and if not to consider engaging alternative resources, internally or externally, so that you will be able to remediate this material weakness*. In making this recommendation we are aware of the cost benefits of any system of internal control and that any decision you make should be done within this context.

***

Our consideration of internal control would not necessarily disclose all matters in internal control that might be deficiencies, significant deficiencies, or material weaknesses.

(Emphasis added).

54.   On June 18, 2013, Medical Marijuana, Inc. issued the following press release:

Medical Marijuana Inc.'s PhytoSPHERE Systems Reports it Has Radically Increased Hemp Production in Expectation of World Wide Demand for 2013 & 2014

Major New Worldwide Production to Add to Cannabinoid Reserves for Product Expansion of CBD, CBG and Host of Hemp Derived Terpenes; PhytoSPHERE Systems Announces Creation of US Hemp Oil Corp -Its Pet Product Line- Cibdex and Skin Care Line -Cibaderm- to be Introduced Later in the Year

June 18, 2013

SAN DIEGO, June 18, 2013 (GLOBE NEWSWIRE) -- Medical Marijuana Inc.

(OTC:MJNA) and PhytoSPHERE Systems are pleased to inform shareholders and the general public that the company has expanded hemp

27

production significantly. With the expansion, the company has increased production of the industry's first natural pharmaceutical-grade CBD-rich oils and derivatives. ***The increased capacity to 6,000 tons of raw base material from 2,000 tons will make PhytoSPHERE Systems one of the largest hemp production companies in the world.***

PhytoSPHERE Systems has recently created US Hemp Oil Corp, which is currently developing the Pet industries first CBD-based Pet Care product line- "Cibdex" as well as an exclusive CBD-cannabinoid Skin Care Line aptly named "Cibaderm".

Increase of Hemp Production to an estimated 6,000 Tons for 2013 Harvest

***PhytoSPHERE Systems has informed shareholders that the company has added 4,000 tons of raw hemp to the present production capabilities of 2,000 tons. The increase in hemp based raw materials increases the company's production capabilities of CBD-rich oils as well as allows the company to increase its production of other cannabinoid rich hemp oils such as Cannabigerol (CBG). Furthermore, this production increase is expected to add the equivalent of 450 tons of Cannabinoid-rich hemp oil to overall reserves- an increase of 300 tons. With the recent licensing agreement with CannaVest Corp the opportunity was created for this increased production which in turn lowered the overall cost of the raw ingredients significantly.*** These costs savings will eventually lead to lower sales prices for finished goods for consumers.

PhytoSPHERE to Invest in Hemp Harvesting and Product Equipment

PhytoSPHERE Systems, in order to keep up with expanding worldwide hemp production, has announced the company will invest in a series of new hemp harvesting and production equipment. This will allow for the added in-ground production to be processed and handled in an efficient manner while keeping the integrity of the supply chain intact and increasing the quality of the production.

PhytoSPHERE to Expand Product Capabilities into Pharmaceutical Market
PhytoSPHERE Systems has additionally announced that it will expand production of cannabidiolic acid (CBD-A) and various terpenes/terpenoids in line with increased demand from pharmaceutical companies and research bodies. PhytoSPHERE will also start to produce significant quantities of a second cannabinoid - cannabigerol (CBG). These simultaneous developments will enable the company to explore additional combinations of products within new and expanding product lines. Research has shown that combining various cannabinoids and terpenoids have increased the overall effects of a single component cannabinoid product. This effect has been coined the "Entourage Effect". The company is positioning itself to supply large quantities of naturally derived cannabinoids, terpenes\terpenoids to the pharmaceutical industry as an additive\enhancing ingredient to their current product portfolio's whereby making the products have the "Entourage Effect" or be more effective against the companies target demographic.

28

(Emphasis added).

55.    On July 31, 2013, Medical Marijuana, Inc. issued the following press release:

> SAN DIEGO, CA, July 31, 2013 - (eTeligis via ACCESSWIRE)- Medical Marijuana Inc. (OTC Pink: MJNA) is pleased to announce that their subsidiary company, Canipa Holdings (www.canipaholdings.com/), has signed an exclusive worldwide distribution and marketing agreement with a prominent European-based pharmaceutical/nutraceutical/cosmetics company. Canipa Holdings will manage the marketing and distribution of the European company's portfolio of over twenty hemp-based consumer products. The products will be added to the HempMeds PX platform.
>
> "Some of the products Canipa Holdings will be marketing and selling are approved for specific medical claims in parts of the European market," says Charles Vest, Director of Communications for HempMeds PX, the marketing company for Medical Marijuana Inc. and all MJNA subsidiary companies. "We want to make clear, however, that these products will be marketed as consumer-only in the United States and its territories."
>
> In the largest transaction that the company has signed to date, Canipa Holdings has also acquired the exclusive online marketing and sales rights for this new portfolio of hemp-based products (excluding The Middle East, Poland, Czech Republic, Hungary, Slovakia, and Latvia). Finally, Canipa Holdings will be the exclusive retail store/brick-and-mortar distributor for these new hemp-based products in all United States and territories as well as Canada and Mexico. The company will seek to negotiate additional territories as markets become viable.
>
> "Nothing like these products exist today," continues Vest. "The European Union (EU), through the European Medicines Agency, is already well aware of the potential health and wellness applications for hemp-based products, evidenced by the fact that this new product portfolio that Canipa has acquired is marketed for specific ailments in parts of the EU."
>
> ***
>
> About HempMeds PX
>
> **HempMeds PX is the master distributor and contracted marketing company for the CannaVest Corp. and Medical Marijuana, Inc. (OTC Pink: MJNA) portfolio of products, including their revolutionary hemp-based CBD products.** HempMeds PX offers mainstream marketing, sales, customer service, and logistics for the cannabis industry. In addition to handling sales and distribution, HempMeds PX is the communication hub for the Medical Marijuana Inc. portfolio of companies.

(Emphasis added).

///

56.     On August 13, 2013, Medical Marijuana, Inc. issued the following press release:

> SAN DIEGO, Aug. 13, 2013 (GLOBE NEWSWIRE) -- Medical Marijuana, Inc. (OTC:MJNA), a leading cannabis and hemp industry innovator, today announced the release of its quarterly financial and shareholders report (Post 8/13/2013 - OTC Markets). The company earned a net income of approximately $6.0 million on gross income of approximately $8.8 million for the quarter ending June 30, 2013. The company launched its highly anticipated marketing and sales arm, HempMeds PX; selected officers for CanChew Biotechnologies; and acquired several additional brands and over 20 products through Canipa Holdings. To better manage the company's growth, Medical Marijuana Inc. relocated to a larger facility in July to accommodate the new HempMeds PX team and to expand its warehouse and distribution capabilities. Below are the company's second quarter 2013 operating and developmental highlights.

> ***

> In addition to working with MJNA and CannaVest, HempMeds PX anticipates offering mainstream marketing, sales, customer service, and logistics for the cannabis industry in the future. Launched the Marketing and Sales for CBD-Rich Hemp Oil (Hemp based Cannabidiol) Real Scientific Hemp Oil (RSHO)

57.     On September 27, 2013, Medical Marijuana, Inc. issued the following press release:

> SAN DIEGO, Sept. 27, 2013 (GLOBE NEWSWIRE) -- ***Medical Marijuana Inc. (OTC Pink: MJNA) is pleased to inform shareholders and the general public that HempMeds PX - a corporate portfolio company of Medical Marijuana Inc. and the exclusive master distributor and contracted marketing company for CannaVest Corp. and Medical Marijuana Inc. - entered the "High CBD (cannabidiol) Award"- winning product at the High Times Medical Cannabis Cup in Seattle, Washington***. Submitted by HempMeds PX on behalf of PhytoSPHERE Systems, the prototype product CBD Simple tested at a record 95.8% CBD, the highest CBD percentage ever documented at the Cannabis Cup.

> ***

> "The enthusiasm for high-CBD products at the Cup represents a huge shift in cannabis culture," said Chris Boucher, Vice President of Product Development for HempMeds PX. "This was the first time the company entered any products into a competition of this kind, and we are thrilled with the result. The support for what we are doing from the cannabis community was overwhelming."

> Michael Mona Jr., President and CEO of CannaVest Corp., accepted the award in Seattle on behalf of PhytoSPHERE Systems and HempMeds PX. "We are very thankful for the hard work of our friends at HempMeds PX, and for the incredible PhytoSPHERE team that produced this game-changing product. We are excited to work together to bring standardized, hemp-based high CBD products to the market," said Mona Jr.

(Emphasis added).

58.   On November 21, 2013, Medical Marijuana, Inc. issued the following press release:

> SAN DIEGO, Nov. 21, 2013 (GLOBE NEWSWIRE) -- Medical Marijuana, Inc. (OTC:MJNA), a leading cannabis and industrial hemp industry innovator, today announced the release of its quarterly financial and shareholders report (Post 11/15/2013 - OTC Markets). The Company earned a net income of approximately $7.9 million on gross income of approximately $10.4 million, derived from sales and the quarterly PhytoSPHERE payment, for the quarter ending September 30, 2013. HempMeds PX - a corporate portfolio company of Medical Marijuana Inc. and the exclusive master distributor and contracted marketing company for CannaVest Corp. and Medical Marijuana Inc. - acquired the marketing contracts for the highly anticipated Cibdex, Cibaderm, and HempVAP product lines, adding additional revenue potential for MJNA. In addition, the Company retained Cheryl Shuman as a spokesperson; exhibited at trade shows nationwide; initiated philanthropic efforts directed towards seizure-related disorder research; and submitted/represented two award-winning hemp-based cannabidiol (CBD) products, including the 2013 High Times Medical Cannabis Cup "high CBD" concentrate winner. Below are the Company's third quarter 2013 operating and developmental highlights. Operating highlights for the third quarter are as follows:
>
> ***
>
> HempMeds PX
>
> ***
>
> Regarding the CannaVest "offering": The money being raised from the sale of the restricted common stock will enable CannaVest to increase harvests and production, which will lower overall cost of hemp CBD. This in turn will enable MJNA and our subsidiaries to have higher margins and to lower the overall cost to the consumer, thereby increasing availability and affordability of hemp CBD. The Company supports this action and anticipates stable, long-term growth from this offering. As of this writing, CannaVest (OTC:CANV) stock remains at $25.50/share.

(Emphasis added).

59.   And on February 5, 2014, Medical Marijuana, Inc. issued the following press release:

> Medical Marijuana Inc.'s HempMeds PX Expands Sales Efforts Based on PhytoSPHERE Systems 1,500% Increase in Industrial Hemp Cannabidiol (CBD) Oil Production
>
> Production Capabilities of Award-Winning CBD-Rich Hemp Oil Scales Up to Address Growing Global Demand
>
> February 5, 2014

SAN DIEGO, Feb. 5, 2014 (GLOBE NEWSWIRE) -- Medical Marijuana Inc. (OTC Pink:MJNA) would like to inform shareholders and the general public that HempMeds PX™ - a corporate portfolio company of Medical Marijuana Inc. and the exclusive master distributor and contracted marketing company for CannaVest Corp. and Medical Marijuana Inc. - is actively expanding global sales based on CannaVest Corp. (OTC:CANV)'s subsidiary, PhytoSPHERE Systems' 1,500% increase in production capability for industrial hemp-based cannabidiol (CBD) oil. PhytoSPHERE's San Diego laboratory houses specialized equipment for high pressure processing of the world's most abundant source of industrial hemp-based CBD oil.

(Emphasis added).

60.     The effect of these releases and the other wrongful conduct alleged herein was that the market and investors were misled about the value of CannaVest's common stock and about its corporate affairs.

61.     During the majority of the Relevant Period, the small number of employees at the Company—five to eight—(and particularly the lack of employees qualified to handle public company financial reporting matters) and the complete absence of internal control over financial reporting (particularly the fact that Defendant Mona, Jr. served both as the Company's CEO/President and CFO) permitted Defendant Mona, Jr. and the other Defendants to manipulate the Company's accounting to suggest that the PhytoSphere acquisition was much more valuable than it actually was and the Company's financial position and results of operations were better than they actually were.

## FALSE AND MISLEADING STATEMENTS

### 1.     CannaVest's Relevant Period Financial Statements were Not Presented in Accordance with GAAP and were Materially False and Misleading

62.     Generally accepted accounting principles ("GAAP") are those principles recognized by the accounting profession as the conventions, rules, and procedures necessary to define accepted accounting practice at a particular time. Those principles are the official standards adopted by the American Institute of Certified Public Accountants ("AICPA"), a private professional association, through three successor

groups it established: the Committee on Accounting Procedure, the Accounting Principles Board, and the Financial Accounting Standards Board ("FASB").

63.     On July 1, 2009, FASB approved the Accounting Standards Codification ("ASC" or the "Codification") as the single source of authoritative U.S. accounting and reporting standards, other than guidance issued by the SEC. The Codification is effective for interim and annual periods ending after September 15, 2009. All existing accounting standards documents are superseded as described in FASB Statement No. 168, *The FASB Accounting Standards Codification and the Hierarchy of Generally Accepted Accounting Principles*. All other accounting literature – other than SEC accounting literature and guidance – not included in the Codification is non-authoritative.

64.     The Codification reorganizes the thousands of U.S. GAAP pronouncements into roughly 90 accounting topics and displays all topics using a consistent structure. It also includes relevant SEC guidance that follows the same topical structure in separate sections in the Codification.

65.     *The Codification does not change GAAP*, it introduces a new structure – one that is organized in an easily accessible, user-friendly online research system.

66.     Compliance with GAAP is a basic fundamental obligation of publicly traded companies. As set forth in SEC Rule 4-01(a) of SEC Regulation S-X, "[f]inancial statements filed with the [SEC] which are not prepared in accordance with [GAAP] will be presumed to be misleading or inaccurate." 17 C.F.R. § 210.4-01(a)(1).

**2.    2013 First Quarter 10-Q and Press Release**

67.     On May 20, 2013, CannaVest filed with the SEC its Form 10-Q for the first quarter ended March 31, 2013 ("2013 First Quarter 10-Q"). This Form 10-Q and the accompanying Sarbanes-Oxley Certification were signed by Defendant Mona, Jr.

68.     The Company's accounting recognition for the PhytoSphere transaction was first reported in the financial statements included in CannaVest's 2013 First Quarter 10-Q. In these financial statements CannaVest reported intangible assets of $33,656,833 and a current liability in the amount of $30,500,000 for the remaining balance owed

69.    MJNA from the "PhytoSphere Agreement." The Company also reported revenues of $1,275,000 and costs of goods sold in the amount of $501,500.

70.    With respect to related party transactions, CannaVest disclosed in the 2013 First Quarter 10-Q:

**RELATED PARTY TRANSACTIONS**

**Stockholders**

On March 1, 2013, the Company issued a Promissory Note (the "Note") to Roen Ventures, LLC, a Nevada limited liability company ("Roen Ventures"), in exchange for loans provided and to be provided in the future in an amount of up to $2,000,000. As of March 31, 2013, the balance on the Note was $430,500. The Note is an unsecured obligation of the Company accruing interest at 5% that is due and payable in two (2) years, on March 1, 2015. The Company's President and member of the Board of Directors, Michael Mona, Jr., holds a 50% interest in Roen Ventures.

71.    The Company made the same disclosures in an amended quarterly report for the first quarter ended March 31, 2013 filed with the SEC on Form 10-Q/A on May 30, 2013.

72.    On June 20, 2013, the Company issued a press release entitled, "CannaVest Corp. Announces First Quarter 2013 Earnings and PhytoSphere Systems Increase in Hemp Production and Expansion of Additional Product Lines." The press release provided in part:

SAN DIEGO, June 20, Jun 20, 2013 (GLOBE NEWSWIRE via COMTEX) -- CannaVest Corp. (OTC:CANV) is pleased to inform shareholders and the general public of the release of First Quarter 2013 earnings. CannaVest Corp. has reported revenues of $1.275 million and gross profit of $773,500 during the first full quarter of company operations, with net income of $337,941, $0.04 per share. The company's full quarterly report and financial statements can be found in the Form 10-Q/A filed by the company with the Securities and Exchange Commission (SEC) on May 30, 2013 (www.sec.gov).

**First Quarter 2013 Results**

***The company's financial performance over the first quarter of 2013 was driven by the sale of raw hemp product to third parties***. During the first quarter of 2013 the company sold and shipped to third parties 51 kilograms of finished CBD products.

*"After the commencement of our business and acquisition of production and supply agreements from Phytosphere Systems in January 2013, we are pleased to report that we are buying and selling to third parties substantial inventories of raw hemp product, which generated our net income of $337,941 in the first quarter of 2013,"* Michael Mona, Jr., Chief Executive Officer of CannaVest Corp. said. "We plan to substantially increase our production capabilities through our existing supply chain partners, and add new partners, with the goal of being the industry leader in the production of natural pharmaceutical-grade CBD-rich oils, and one of the largest hemp production companies in the world."

(Emphasis added).

73.   Defendants' statements above were materially false and misleading in that they misrepresented CannaVest's financial position and results of operations and that the Company's financial statements complied with GAAP when they did not. Among other things, Defendants overstated intangible assets and omitted a material related party transaction (that 100% of the Company's revenues for the quarter were derived from sales to related party Medical Marijuana, Inc.).

**3.   2013 Second Quarter 10-Q**

74.   On August 13, 2013, CannaVest filed with the SEC its Form 10-Q for the second quarter ended June 30, 2013 ("2013 Second Quarter 10-Q"). This Form 10-Q and the accompanying Sarbanes-Oxley Certification were signed by Defendant Mona, Jr.

75.   In its financial statements included in the 2013 Second Quarter 10-Q CannaVest reported $26,998,125 in goodwill and $4,995,895 in intangible assets.

76.   CannaVest made no related party disclosures in the 2013 Second Quarter 10-Q.

77.   Defendants' statements above were materially false and misleading in that misrepresented CannaVest's financial position and results of operations and that the Company's financial statements complied with GAAP when they did not. Among other things, defendants overstated goodwill and intangible assets and failed to disclose a material related party transaction (that 100% of the Company's revenues for the quarter were derived from sales to related party Medical Marijuana, Inc.).

///

### 4. 2013 Third Quarter 10-Q

78. On November 14, 2013, CannaVest filed with the SEC its Form 10-Q for the third quarter ended September 30, 2013 ("2013 Third Quarter 10-Q"). This Form 10-Q and the accompanying Sarbanes-Oxley Certification were signed by Defendant Mona Jr.

79. In its financial statements included in the 2013 Third Quarter 10-Q the Company reported $4,466,666 in intangible assets and an impairment of goodwill in the amount of $26,998,125.

80. CannaVest made no related party disclosures in its 2013 Third Quarter 10-Q.

81. Defendants' statements above were materially false and misleading in that misrepresented CannaVest's financial position and results of operations and that the Company's financial statements complied with GAAP when they did not. Among other things, Defendants overstated goodwill and intangible assets and omitted a material related party transaction (that 100% of the Company's revenues for the quarter were derived from sales to related party Medical Marijuana, Inc.).

### 5. CannaVest Overstated its Goodwill and Intangible Assets

82. CannaVest's accounting recognition for the PhytoSphere transaction was first reported in the Company's first quarter 2013 financial statements. Specifically, CannaVest reported intangible assets of $33,656,833 and no goodwill. The Company also reported revenues of $1,275,000 and costs of goods sold in the amount of $501,500.

83. In its second quarter 2013 financial statements, CannaVest reported $26,998,125 in goodwill and $4,995,895 in intangible assets.

84. In its third quarter 2013 financial statements, CannaVest reported $4,466,666 in intangible assets and an impairment of goodwill in the amount of $26,998,125.

85. On April 3, 2014, CannaVest acknowledged for the first time that it had misreported its financial position and its results of operations on the Company's Forms

10-Q for the quarters ended March 31, 2013, June 30, 2013, and September 30, 2013, and as such, CannaVest's 2013 first, second, and third quarter financial statements included in the Forms 10-Q could no longer be relied upon and would need to be restated. More specifically, the press release stated, in part:

> The Company has determined that it is necessary to correct such errors because the allocation methodology used by management, the resulting carrying amount of intangible assets and goodwill, and the resulting amortization cost and goodwill impairment were not in accordance with GAAP.

86.    Thus, CannaVest admitted that its financial statements for the first, second and third quarters of 2013 were materially false and misleading. *See* 17 C.F.R. § 210.4-01(a)(1).

87.    Subsequently, CannaVest disclosed:

> ***Specifically, management determined that the purchase price and the allocation of the purchase price [of PhytoSphere] as previously disclosed in the Forms 10-Q were not in accordance with accounting principals generally accepted in the United States ("GAAP").*** The Company initially reported the acquisition of the Assets (the "Transaction") based on the negotiated purchase price of $35 million which had a floor and ceiling locked on the value of the Company's common stock to be issued of between $4.50 and $6.00, as reflected in the Agreement for Purchase and Sale of Assets entered into by the Company and PhytoSPHERE. In reviewing the price that the Company's common stock was trading at during the year, ***management determined that although the negotiated price of the Transaction was $35 million, that price may not represent the fair market value of the Assets acquired. As a result, management determined that obtaining a valuation of the Assets would be required in order to determine the fair value of the Assets acquired.*** The valuation resulted in a fair value of approximately $8 million. Accordingly, management concluded that the valuation of $8 million for the Assets to be the most reliable measure of fair value of the Transaction for the Company. In addition, management determined that sales and cost of sales for the quarter ended March 31, 2013 were incorrect.

(Emphasis added).

88.    CannaVest further disclosed that as a result, the carrying amount of intangible assets and goodwill in the Company's condensed consolidated balance sheets included in the Company's first, second and third quarter Forms 10-Q would be reduced. For example, for the first quarter 2013, the Company disclosed:

1
2
3
4
5

Intangible assets as presented in the financial statements as of March 31, 2013 were in error. The financial statements previously included $34,045,000 of intangible assets acquired in connection with the PhytoSPHERE Transaction, which were labeled as goodwill on the statement of cash flows and classified as intangible assets on the balance sheet. As determined by the valuation of the assets purchased under the PhytoSPHERE Agreement, intangible assets totaled $4,110,000 and goodwill totaled $1,855,512.

6   89.   CannaVest's accounting irregularities were the result of the Defendants'

7   intentional or reckless misapplication of clear accounting principles. It was also, as

8   further described below, the result of Defendants' conscious failure to implement

9   effective control over CannaVest's financial reporting. As a result of Defendants'

10   accounting irregularities, CannaVest overstated its intangible assets for the first, second

11   and third quarters of 2013, its goodwill was for the second quarter of 2013, and its

12   revenues for the first quarter 2013.

13   90.   In its Form 10-K for the year ended December 31, 2013, filed with the SEC

14   on March 28, 2014, CannaVest disclosed that it had "accounted for the acquisition of the

15   assets of PhytoSphere Systems, LLC in accordance with the Accounting Standards

16   Codification ("ASC") Topic 805, Business Combinations ('ASC Topic 805')." "ASC

17   Topic 805 establishes principles and requirements for recognizing and measuring the

18   total consideration transferred to and the assets acquired, liabilities assumed and any

19   non-controlling interests in the acquired target in an asset purchase," CannaVest

20   disclosed. The Company further disclosed that "ASC Topic 805 also provides guidance

21   for recognizing and measuring goodwill acquired and other tangible and intangible

22   assets."

23   91.   GAAP required CannaVest to account for its acquisition of the assets of

24   PhytoSphere pursuant to the requirements of ASC 805, *Business Combinations*. It

25   appears that the Company utilized the acquisition (purchase) method prescribed under

26   certain provisions of ASC 805. Under the purchase method of accounting, the assets

27   acquired and liabilities assumed are initially recorded at their respective fair market

28   values. The excess of the purchase price over the fair value of the net assets acquired is

recognized and reported as an asset called goodwill. Goodwill is considered to be an asset because future benefits are expected from it in combination with the future benefits of other assets acquired in the acquisition.

92.    ASC 805 provides guidance on the accounting and reporting for transactions that represent business combinations to be accounted for under the acquisition method. ASC 805-10-05-1; ASC 805-10-05-4.

93.    The acquisition method requires the acquirer to recognize, separately from goodwill, the identifiable assets acquired, the liabilities assumed, and any non-controlling interest in the acquiree. ASC 805-20-25-1.

94.    Moreover, the acquirer shall recognize separately from goodwill the identifiable intangible assets acquired in the business combination. An intangible asset is identifiable if it meets either the separability criterion or the contractual-legal criterion described in the definition of identifiable. ASC 805-20-25-10.

95.    An asset is separable if it is capable of being separated or divided.  An intangible asset meets the contractual-legal criterion if it arises from contractal or other legal rights, regardless of whether those rights are transferable or separable from the entity of from other rights and obligations. ASC 805-10-20. (Glossary).

96.    The acquirer shall measure the identifiable assets acquired, the liabilities assumed, and any non-controlling interest in the acquiree at their acquisition-date fair values. ASC 805-20-30-1.

97.    As set forth above, Defendants allowed the Company to violate GAAP in that it misapplied clear accounting principles.

98.    CannaVest, Mona, Mackay, Titus and Llamas were all sued by a proposed class of shareholders for securities fraud in the United States District Court for the Southern District of New York[3]  and by the SEC in the United States District Court for

///

---

[3]    *In re CannaVest Corp. Securities Litigation*, 14-cv-2900 (PG) (S.D.N.Y.)

the District of Nevada.[4]  Confidential Witness ("CW 1") from the related securities fraud action, a financial consultant who joined the Company in May 2013, knew "right away" that CannaVest had misapplied its accounting and the Company's financial statements would need to be restated. CW 1, a financial consultant specializing in the life sciences field, served as a consultant for and at CannaVest from about May 2013 until CannaVest's audit was completed the following spring of 2014. CW 1 worked directly with Defendant CEO Mona, Jr., and reported frequently to the CannaVest Board of Directors, including non-party Wilson, a CPA and a Director of CannaVest at the time.

99.    As soon as CW 1 started working with CannaVest, CW 1 said, he/she recognized immediately that a restatement of the Company's financial statements would be needed due to the way goodwill had been booked and as a result of unreliable valuation methods used for same. Specifically, immediately upon viewing the most recent quarterly statement (2013 Q1), CW 1 noticed that CannaVest was improperly amortizing goodwill from the PhytoSphere acquisition, which CW 1 recognized as improper accounting.[5] However, CW 1 said, the specific restatement could not be known until a full audit had been conducted. "I knew we were going to have to get a re-evaluation on the assets, but I didn't want to restate with incomplete information," CW 1 said.

100.    That CannaVest had improperly amortized goodwill was a red flag for CW 1 because goodwill is not supposed to be amortized but instead is supposed to be tested annually for any impairment. CW 1 also saw plainly that the inventory was valued by a dollar figure per kilogram, while sales prices were based on the percentage of cannabidiol in each product. This inconsistency made no sense to CW 1.

///

---

[4]    *Securities and Exchange Commission v. CannaVest Corp. a/k/a CV Sciences, Inc. and Michael J. Mona, Jr.*, 2:17-cv-01681-APG-PAL (D. Nev.).

[5]    As admitted by the Company, *see* above, CannaVest amortized its intangible assets in the first quarter 2013, recognizing it as a non-cash expense item for amortization of goodwill in its cash flow statement for that same quarter.

101.   CW 1 said the discussion about the need to restate began after CW 1's arrival in May 2013 and that it took place between CW 1 and Defendant CEO Mona, Jr. and members of the Company's Board of Directors. CW 1 said his/her notes and access to correspondence are gone, but some of these discussions likely took place through written reports, memorandums and/or emails. "My notes are gone [but] I recall that I mentioned that [re-valuation of assets and restatement] to Mike [Mona Jr.] once, if not more than once, and probably [to] the board," CW 1 said. CW 1 revealed that there were extensive discussions among top management, the auditors and counsel as to whether or not the Company would have to restate its financials. "I remember hearing, 'Oh, it makes us look like we don't know what we're doing,'" CW 1 said, regarding the discussions with Defendant CEO Mona, Jr. and the Board of Directors.

102.   CW 1 believes CannaVest's original valuation of its acquisition of PhytoSphere was conducted by then-Director Wilson. Wilson was a partner in the Las Vegas CPA firm, Wilson & Company.

**6.   CannaVest Failed to Disclose Material Related Party Transactions in Violation of GAAP**

103.   GAAP and SEC regulations provide that a public company and its management must disclose related party transactions in financial statements filed with the SEC. ASC provides guidance on, and requirements for, the disclosure of transactions with related parties.

104.   ASC 850-10-50-1 provides that financial statements shall include disclosures of material related party transactions, other than compensation arrangements, expense allowances, and other similar items in the ordinary course of business.

105.   For SEC Registrants, such as CannaVest, SEC Regulation S-X, Rule 4-08(k)(1) sets forth the following additional requirements with respect to financial statements required to be filed with the SEC in that related party transactions should be identified and the amounts stated on the face of the balance sheet, income statement, or statement of cash flows.

106.   On April 24, 2014 — CannaVest disclosed for the first time that 100% of its revenues from each of the first, second, and third quarters 2013 were from sales to related party Medical Marijuana, Inc.

107.   That all CannaVest's sales were made to Medical Marijuana, Inc. was material to investors. Indeed, GAAP provides that ***transactions involving related parties cannot be presumed to be carried out on an arm's-length basis, as the requisite conditions of competitive, free-market dealings may not exist***. ASC 850-10-50-5. As generally accepting auditing standard, AU § 334.12 explains, "it will generally not be possible to determine whether a particular transaction would have taken place if the parties had not been related, or assuming it would have taken place, what the terms and manner of settlement would have been." It is precisely because related party transactions lend themselves to favorable terms and/or fraudulent conduct that might not exist in transactions between unrelated parties that GAAP requires disclosure of material related party transactions. "***Information about transactions with related parties that would make a difference in decision making shall be disclosed so that users of the financial statements can evaluate their significance****."* ASC 850-10-05-10 (emphasis added).

108.   Related parties may enter into transactions that give the appearance of having been conducted on an arm's-length basis in order to misrepresent the actual risk of the enterprise. As such, the potential for fraud or misconduct is significant because related party transactions provide an excellent opportunity to hide malfeasance. By failing to record related party transactions or reveal the related party nature, insiders can use these transactions to disguise compensation, misappropriate assets, and/or misstate financial statements. Even if misrepresentation is not intended, the nature of related party transactions is such that their terms may be more favorable than those attainable by an outside party. As a consequence, the economic reality of a particular business event may not be apparent without complete disclosure.

109.   A further concern about related party transactions is the possibility that the parties are committing fraud. *Id.* at 9. The auditing interpretation to Statements on the

Auditing Standards No. 45 (AU § 334) states that the "***risk associated with management's assertions about related party transactions is often assessed as higher than for many other types of transactions because of the possibility that the parties to the transaction are motivated by reasons other than those that exist for most business transactions*** *Id.* (Emphasis added).

110.    Defendants failed to disclose that all of the Company's revenues for the first, second and third quarters of 2013 were from sales to a related party. As a result, CannVest's financial statements for each of these quarters were not compliant with GAAP and were materially false and misleading.

**7.    Throughout and Prior to the Relevant Period, as Defendants Knew, CannaVest had Significant Deficiencies and Material Weaknesses in its Control Over Financial Reporting**

111.    CannaVest has a history of "significant deficienc[ies]" and "material weakness[es]" in its control over financial reporting which predated and continued throughout the Relevant Period. Defendants were aware of these material weaknesses prior to and throughout the Relevant Period. Defendants were at a minimum culpably reckless in misrepresenting that the Company's financial statements complied with GAAP, despite their knowledge that significant deficiencies and material weaknesses in CannaVest's control over financial reporting had not been remediated at the time such statements were made, and thus Defendants had no basis for allowing the Company to make such representations.

112.    Subsequently, in its Forms 10-Q for the first quarter ended March 31, 2013, second quarter ended June 30, 2013, and third quarter ended September 30, 2013 CannaVest reported material weaknesses in its internal control over financial reporting: "The Company's management has identified a material weakness in the effectiveness of internal control over financial reporting related to a shortage of resources in the accounting department required to assure appropriate segregation of duties with employees having appropriate accounting qualifications related to the Company's unique industry accounting and disclosure rules."

113.   In its Form 10-K for the fourth quarter and year ended December 31, 2013, CannaVest made these further disclosures:

> **[T]he Company's management concluded that the Company's internal controls over financial reporting were not effective in that there were material weaknesses as of December 31, 2013. …**
>
> A material weakness is a deficiency or combination of deficiencies in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of the annual or interim financial statements will not be prevented or detected on a timely basis by the Company's internal controls.
>
> ***
>
> **Management is aware that there is a lack of segregation of duties and accounting personnel with appropriate qualifications at the Company due to the small number of employees dealing with general administrative and financial matters**. This constitutes a deficiency in the internal controls. Management has taken steps to rectify these deficiencies. The Company hired a full-time Controller in February 2014 who is focused on developing policies and procedures to require proper segregation of duties.
>
> Management is aware that there is a lack of proper controls related to the inventory purchase cycle. Specifically, there is a lack of control functions and segregation of duties involved with purchasing and receiving inventory. This constitutes a deficiency in internal controls. The Company will implement proper controls and add additional employees to the process to improve segregation of duties.
>
> **<u>Management is aware of a deficiency related to improper determination of the purchase price allocation for the assets acquired related to PhytoSphere Systems. This constitutes a deficiency in internal controls. Specifically, management determined that the purchase price used and the allocation of the purchase price as previously disclosed in the Company's Form 10Q's were not in accordance with GAAP. As a result of this deficiency, Forms 10Q filed by the Company for Q1, Q2 and Q3 2013 cannot be relied upon as the information included therein is materially incorrect</u>.**

(Emphasis added).

114.   CW 1, the financial consultant who served as a consultant for and at CannaVest from about May 2013 until CannaVest's audit was completed the following spring of 2014, expounded on CannaVest's significant deficiencies and material weaknesses in the Company's control over financial reporting. Again, CW 1 worked

///

directly with Defendant CEO Mona, Jr., and reported frequently to the CannaVest board of directors, including then-Director Wilson, a CPA.

115.   CW 1 described his job as a consultant at CannaVest as trying to "bring order to chaos." CW 1 said much of the chaos he/she encountered stemmed from accounting functions being handled by people ill equipped for the task. CW 1 named then-Director Wilson as an example

116.   Then-Director Wilson was a director and President of Wilson & Company, a professional certified public accounting firm in Las Vegas, Nevada. Based on information provided by CW 1 and referenced in SEC documents, it appears that Turner & Stone took over CannaVest's accounting from Wilson & Company. "Ed [Wilson] had been a member of the Board of Directors, and his firm had done some accounting work initially," CW 1 said. Turner & Stone was followed by Anton & Chia (resigned November 14, 2013), which in turn was followed by PKF International (engaged January 14, 2014). Anton & Chia was serving as the Company's auditor, doing quarterlies, CW 1 said, when he/she arrived at CannaVest, and he/she recommended its replacement.

117.   CW 1 assumed (but did not know for sure) it was Wilson & Company that oversaw the initial transaction with PhytoSphere and the valuation of the goodwill. CW 1 believed it was Wilson's firm that improperly amortized the goodwill. CW 1 suggested that Wilson & Company was out of its element providing financial reporting services to CannaVest. "All I know is that they don't normally play in this space," CW 1 said, referring to complex filings for publicly traded companies. "From what I understand, they do primarily tax, and they're probably not someone who looks at new technologies and how to value it."

118.   CannaVest's Form 10-Q as filed with the SEC on or about May 20, 2013 reported accounts receivable of as of March 31, 2013 in the sum of $1,671,438, intangible assets (which included goodwill) of $33,656,833, revenue of $1,275,000, and Cost of Goods Sold of $501,500.  This Form 10-Q, which was signed by Defendant

Mona as President and CEO of CannaVest, was subsequently amended with an explanation which stated:

> This Amendment No. 2 to Form 10-Q/A ("Amendment No. 2") amends Amendment No. 1 of the Quarterly Report of CannaVest Corp. (the "Company") on Form 10-Q for the quarter ended March 31, 2013, as filed with the Securities and Exchange Commission on May 30, 2013 (the "Amendment 1"). This Amendment No. 2 is being filed for the purpose of restating our Financial Statements, amending related disclosure in the section titled Management's Discussion and Analysis of Financial Condition and in the Notes to Financial Statements and conforming the disclosures in the Notes to Financial Statements to those contained in the Company's Annual Report on Form 10-K for the fiscal year ended December 31, 2013. This restatement is related to the reporting of the purchase price and allocation thereof related to the purchase of certain assets of PhytoSphere Systems, LLC.  We have determined that the purchase price and allocation of the purchase price originally reported did not represent the fair market value of the transaction in accordance with accounting principals generally accepted in the United States. In addition, management determined that sales and cost of sales originally reported for the quarter ended March 31, 2013 were incorrect. This Amendment No. 2 will include corrections of those amounts and resulting changes to the financial statements.

> We have not updated the information contained herein for events occurring subsequent to May 30, 2013, the filing date of the Original Filing.

119.    The Amended Form 10-Q contained the following disclosures which were omitted from the original filing with the SEC:

**6.**  RELATED PARTY TRANSACTIONS

> On March 1, 2013, the Company issued a Promissory Note (the "Note") to Roen Ventures, LLC, a Nevada limited liability company ("Roen Ventures"), in exchange for loans provided and to be provided in the future in an amount of up to $2,000,000.  As of March 31, 2013, the balance on the Note was $1,080,500.  The Note is an unsecured obligation of the Company accruing interest at 5% that is due and payable in two (2) years, on March 1, 2015. The Company's President and member of the Board of Directors, Michael Mona, Jr., holds a 50% interest in Roen Ventures.

> ***100% of the Company's revenue of $1,082,375 for the three months ended March 31, 2013 and accounts receivable totaling $1,478,813 as of March 31, 2013, were from***

*affiliates of Medical Marijuana, Inc., a stockholder of the Company*.

7. LINE OF CREDIT - ROEN VENTURES, LLC
On March 1, 2013, the Company entered into a lending arrangement with Roen Ventures, which is owned 50% by the Company's President, Secretary and Treasurer who is also a director. The promissory note is for up to $2,000,000, bears interest at 5.0% and is unsecured. There are no specific repayment terms except that all unpaid principal and accrued interest is due and payable on March 1, 2015. As of March 31, 2013, the Company has a balance of $1,080,500 on this promissory note.

120.   Financial statement restatements were described as follows:

a)   The financial statements for the three months ended March 31, 2013 recognized revenue and accounts receivable of $192,625 and cost of goods sold of $296,050 that should not have been recognized. Revenues and accounts receivable in the amount of $192,625 related to the sales value of inventory that was transferred to a manufacturer for inclusion in finished goods and an error in calculating the price of the ending inventory as of the end of the period. Cost of goods sold in the amount of $296,050 related to the cost of inventory sent for manufacturing in the amount of $39,865 being included in cost of goods sold and $256,185 relating to errors related to calculating ending inventory.

b)   Not all of the prepaid inventory purchased as part of the PhytoSphere Transaction in the amount of $1,260,510 was included in the financial statements as of March 31, 2013. This resulted in an overstatement of intangible assets and an understatement of prepaid inventory for the period. Prepaid inventory represents the amount of inventory purchased but not yet received prior to closing the Transaction, the rights to receive the inventory and subsequent receipt of inventory transferred to the Company upon closing of the Transaction.

c)   Amortization expense as reported in the financial statements for the three months ended March 31, 2013, in the amount of $378,167, was in error. Based on the restated value of assets purchased from PhytoSphere, intangible assets totaled $4,110,000. Restated amortization on those assets for the three months ended March 31, 2013, is $137,000, representing a decrease of $241,167 for the period. This resulted in an overstatement of amortization expense and operating expenses of $241,167.

d)   Intangible assets as presented in the financial statements as of March 31, 2013 were in error. The financial statements previously included $34,045,000 of intangible

assets acquired in connection with the PhytoSphere Transaction, which were labeled as goodwill on the statement of cash flows and classified as intangible assets on the balance sheet. As determined by the valuation of the assets purchased under the PhytoSphere Agreement, intangible assets totaled $4,110,000 and goodwill totaled $1,855,512. *The effect of this error resulted in overstatement of intangible assets of $28,079,488.*

e)   The amount previously reported as due to PhytoSphere pursuant to the Agreement as of March 31, 2013 was reported as $30,500,000. This was calculated based on a Transaction amount of $35,000,000 and a set per share price between $4.50 and $6.00 under the Agreement. In reviewing the price that the Company's common stock was trading at during the year, subsequent to March 31, 2013, management determined that using a per share price to value the Transaction may not represent a true measure of the fair market value of the Transaction and that obtaining a valuation of the assets purchased from PhytoSphere would be required in order to determine the fair market value of the business acquired. Accordingly, management determined that the valuation of $8,020,000 represented a more reliable measure of the fair value of the Transaction. As a result of that valuation, the per share price for shares of common stock issued to PhytoSphere was adjusted to $1.21 to reflect the revised value of the Transaction. Accordingly, the amount recorded upon issuance of the shares of common stock to PhytoSphere and the total amount due to PhytoSphere was adjusted to reflect the value of the Transaction. *As a result, the amount shown as due to PhytoSphere was overstated by $23,572,360. Further, the value of the shares of common stock issued through March 31, 2013 to PhytoSphere was overstated by $3,407,640.*

f)   Inventory as originally reported in the financial statements as of March 31, 2013, was understated by $125,027. This was a result of an overstatement of cost of goods sold in the amount of $296,050, offset by an adjustment for the value of inventory acquired from PhytoSphere in the amount of $171,023. (emphasis added).

121.   CannaVest's Form 10-Q as filed with the SEC on or about August 13, 2013 reported accounts receivable and goodwill of $1,561,496 and $26,998,125, respectively, as of June 30, 2013. It also reported revenue of $107,683 and cost of goods sold of $16,292 for the quarter ended June 30, 2013. This Form 10-Q, which was signed by Defendant Mona as President and CEO of CannaVest, was subsequently amended with an explanation which stated:

This Amendment No. 1 to Form 10-Q ("Amendment No. 1") amends the Quarterly Report of CannaVest Corp. (the "Company") on Form 10-Q for the quarter ended June 30, 2013 as filed with the Securities and Exchange Commission on August 13, 2013 (the "10-Q"). This Amendment No. 1 is being filed for the purpose of restating our Financial Statements, amending related disclosure in the section titled Management's Discussion and Analysis of Financial Condition and in the Notes to the Financial Statements and conforming the disclosures in the Notes to the Financial Statements to those contained in the Company's Annual Report on Form 10-K for the fiscal year ended December 31, 2013.

This restatement is related to the reporting of the purchase price and allocation thereof related to the purchase of certain assets of PhytoSphere Systems, LLC. We have determined that the purchase price and allocation of the purchase price originally reported did not represent the fair market value of the transaction in accordance with accounting principals generally accepted in the United States. This Amendment will include corrections of those amounts and resulting changes to the financial statements.

We have not updated the information contained herein for events occurring subsequent to August 13, 2013, the filing date of the Original Filing.

122.   The Amended Form 10-Q contained the following disclosures which were omitted from the original filing with the SEC:

6. RELATED PARTY TRANSACTIONS
On March 1, 2013, the Company entered into a lending arrangement with Roen Ventures, LLC, a Nevada limited liability company ("Roen Ventures"), which is owned 50% by the Company's President and Chief Executive Officer who is also a director, Michael Mona, Jr. The Promissory Note (the "Note") issued to Roen Ventures provides a line of credit up to $4,000,000, bears interest at 5.0% and is unsecured. As previously disclosed in the Company's Current Report on Form 8-K filed with the SEC on July 31, 2013, on July 25, 2013, the disinterested members of our Board of Directors (the "Board") approved an amendment to the terms of the Note to increase the line of credit to $6,000,000 and provide for the ability of Roen Ventures to convert, in its sole discretion, the outstanding balance of the Note into shares of the common stock of the Company at a conversion price to be determined following the conclusion of a valuation of the common stock of the Company. There are no specific repayment terms except that all unpaid principal and accrued interest under the Note is due and payable on July 25, 2015.

49

As of June 30, 2013, the Company had a balance of $3,280,500 on this Note. Management has not yet determined the value of the conversion feature.

**At June 30, 2013, 100% of the Company's revenue of $107,683 and $1,190,058 for the three and six months ended June 30, 2013, respectively, and accounts receivable totaling $1,561,496 at June 30, 2013, were from affiliates of Medical Marijuana, Inc., a stockholder of the Company.**

7. LINE OF CREDIT - ROEN VENTURES, LLC
As discussed in Note 6 above, on March 1, 2013, the Company entered into a lending arrangement with Roen Ventures, which is owned 50% by the Company's President and Chief Executive Officer who is also a director, Michael Mona, Jr. The Note issued to Roen Ventures provides a line of credit up to $4,000,000, bears interest at 5.0% and is unsecured. As previously disclosed in our Current Report on Form 8-K filed with the SEC on July 31, 2013, on July 25, 2013, the disinterested members of the Company's Board of Directors approved an amendment to the terms of the Note to increase the line of credit to $6,000,000 and provide for the ability of Roen Ventures to convert, in its sole discretion, the outstanding balance of the Note into shares of the common stock of the Company at a conversion price to be determined following the conclusion of a valuation of the common stock of the Company. There are no specific repayment terms except that all unpaid principal and accrued interest under the Note is due and payable on July 25, 2015. As of June 30, 2013, the Company had a balance of $3,280,500 on this Note. Management has not yet determined the value of the conversion feature. (emphasis added).

123.   The Company's financial statement restatements were described as follows:

a)   Amortization expense as previously reported for the three and six months ended June 30, 2013, in the amounts of $573,325 and $951,492, respectively, was in error. Based on the restated value of assets purchased from PhytoSphere, intangible assets totaled $4,110,000. Restated amortization on those assets for the three and six months ended June 30, 2013 is $205,500 and $342,500, respectively. **This resulted in an overstatement of amortization expense and operating expenses of $367,825 and $608,992 for the three and six months ended June 30, 2013, respectively.**

b)   Intangible assets previously reported in the financial statements as of June 30, 2013 were in error. The financial statements previously reported $5,947,387 of intangible assets acquired in connection with the PhytoSphere Transaction. As determined by the valuation of the assets purchased under the

PhytoSphere Agreement, intangible assets totaled $4,110,000. This overstatement of $1,837,387 was partially offset by an overstatement of accumulated amortization of $608,992 as noted above. ***The resulting overstatement of intangible assets at June 30, 2013 was $1,228,395.***

c) ***Goodwill previously reported in the financial statements at June 30, 2013 was overstated by $25,142,613.*** The goodwill reported was $26,998,125, previously determined based on a transaction amount of $35,000,000 for the PhytoSphere Transaction. The valuation of acquired assets set a value of goodwill of $1,855,512. The difference of $25,142,613 represents the difference between these two amounts.

d) The amount previously reported as due to PhytoSphere pursuant to the PhytoSphere Agreement at June 30, 2013 was reported as $23,750,000. This was calculated based on a Transaction amount of $35,000,000 and a set per share price between $4.50 and $6.00 under the PhytoSphere Agreement. In reviewing the price that the Company's common stock was trading at during the year, subsequent to June 30, 2013, management determined that using a per share price to value the Transaction may not represent a true measure of the fair market value of the Transaction and that obtaining a valuation of the assets purchased from PhytoSphere would be required in order to determine the fair market value of the business acquired. Accordingly, management determined that the valuation of $8,020,000 represented a more reliable measure of the fair value of the Transaction. As a result of that valuation, the per share price for shares of common stock issued to PhytoSphere was adjusted to $1.21 to reflect the revised value of the Transaction. Accordingly, the amount recorded upon issuance of the shares of common stock to PhytoSphere and the total amount due to PhytoSphere was adjusted to reflect the value of the Transaction. As a result, the amount due to PhytoSphere was revised to $4,963,906 and the value of common stock reflected for the shares of common stock issued as payment in the Transaction was $2,306,094. ***As a result, the amount shown as due to PhytoSphere at June 30, 2013 was overstated by $18,786,094 and the amount recorded for the shares of common stock issued to PhytoSphere through June 30, 2013 was overstated by $8,193,906. (emphasis added).***

124. CannaVest's Form 10-Q as filed with the SEC on or about November 14, 2013 reported accounts receivable of $1,661,733 and intangible assets of $4,466,666 as of September 30, 2013. It also reported goodwill impairment of $26,998,125, revenue of $163,662, and cost of goods sold of $48,551 for the quarter ended September 30,

2013.  This Form 10-Q, which was signed by Defendant Mona as President and CEO of

CannaVest, was subsequently amended with an explanation which stated:

> This Amendment No. 2 to Form 10-Q ("Amendment No. 2")
> amends the Quarterly Report of CannaVest Corp. (the
> "Company") on Form 10-Q for the quarter ended September
> 30, 2013, as filed with the Securities and Exchange
> Commission (the "SEC") on November 14, 2013, as amended
> by the Amendment No. 1 to the Quarterly Report on Form 10-
> Q for the quarter ended September 30, 2013, as filed with the
> SEC on November 21, 2013 (collectively, the "10-Q").  This
> Amendment No. 2 is being filed for the purpose of restating
> our Financial Statements, amending related disclosure in the
> section titled Management's Discussion and Analysis of
> Financial Condition and in the Notes to the Financial
> Statements and conforming the disclosures in the Notes to the
> Financial Statements to those contained in the Company's
> Annual Report on Form 10-K for the fiscal year ended
> December 31, 2013. This restatement is related to the
> reporting of the purchase price and allocation thereof related
> to the purchase of certain assets of PhytoSphere Systems,
> LLC.  We have determined that the purchase price and
> allocation of the purchase price originally reported did not
> represent the fair market value of the transaction in
> accordance with accounting principals generally accepted in
> the United States.  This Amendment No. 2 will include
> corrections of those amounts and resulting changes to the
> financial statements.
>
> We have not updated the information contained herein for
> events occurring subsequent to November 14, 2013, the filing
> date of the Original Filing.

125.   The Amended Form 10-Q contained the following disclosures which were

omitted from the original filing with the SEC:

> 6. RELATED PARTY TRANSACTIONS
> On March 1, 2013, the Company entered into a lending
> arrangement with Roen Ventures, LLC, a Nevada limited
> liability company ("Roen Ventures"), which is owned 50% by
> the Company's President and Chief Executive Officer who is
> also a director, Michael Mona, Jr.  The Promissory Note (the
> "Note") issued to Roen Ventures provides a line of credit up
> to $4,000,000, bears interest at 5.0% and is unsecured.  As
> previously disclosed in the Company's Current Report on
> Form 8-K filed with the SEC on July 31, 2013, on July 25,
> 2013, the disinterested members of our Board of Directors
> (the "Board") approved an amendment to the terms of the
> Note to increase the line of credit to $6,000,000 and provide
> for the ability of Roen Ventures to convert, in its sole

discretion, the outstanding balance of the Note into shares of the common stock of the Company at a conversion price to be determined following the conclusion of a valuation of the common stock of the Company.   There are no specific repayment terms except that all unpaid principal and accrued interest under the Note is due and payable on July 25, 2015. As of September 30, 2013, the Company had a balance of $4,780,500 on this Note.   As of September 30, 2013, management had not yet determined the value of the conversion feature.

*At September 30, 2013, 100% of the Company's accounts receivable totaling $1,661,733 were from affiliates of Medical Marijuana, Inc., a stockholder of the Company. For the three and nine months ended September 30, 2013, the Company recognized revenues of $163,662 and $1,353,720, respectively. 100% of those revenues related to sales to affiliates of Medical Marijuana, Inc*.

7. LINE OF CREDIT - ROEN VENTURES, LLC
As discussed in Note 6 above, on March 1, 2013, the Company issued the Note to Roen Ventures, in exchange for loans provided and to be provided in the future in an amount of up to $2,000,000, which was subsequently increased to $4,000,000, then further increased to $6,000,000.   As of September 30, 2013, the balance on the Note was $4,780,500. The Note is an unsecured obligation of the Company accruing interest at 5% that is due and payable in two years, on July 25, 2015.   The Company's President and member of the Board, Michael Mona, Jr., holds a 50% interest in Roen Ventures.   As previously disclosed in our Current Report on Form 8-K filed with the SEC on July 31, 2013, the disinterested members of our Board approved an amendment to the terms of the Note to increase the credit line to $6,000,000 and provide for the ability of Roen Ventures to convert, in its sole discretion, the outstanding balance of the Note into shares of the common stock of the Company at a conversion price determined following the conclusion of a valuation of the Company's common stock.

Subsequent to September 30, 2013, the valuation determined pursuant to Financial Accounting Standards Board Accounting Standards Codification 718 Stock Compensation, (the "Valuation") determined that the fair market value of our restricted common stock is $0.68 per share. On November 7, 2013, disinterested members of the Board approved an amendment to the Note to allow for conversion of the Note at a conversion price equal to $0.60 per share, which represents a discount of approximately 12% off the fair market value of our restricted common stock.   As of November 14, 2013, the balance of the Note is $6,000,000.   Roen has informed the Board it intends to convert the outstanding balance of the

Note into shares of common stock of the Company. Upon conversion of the Note, a total of 10,000,000 shares of the Company's common stock will be issued to Roen Ventures.

The Company has determined that the conversion feature is considered a beneficial conversion feature and determined its value on July 25, 2013, the date of the amendment, for increasing the line of credit to $6,000,000, to be $637,400. The Company calculated the beneficial conversion feature at its intrinsic value. Accordingly, the beneficial conversion feature has been accounted for as a discount to the Note and will be amortized using the effective interest method as an expense over the remaining life of the Note. The amortization of debt discounts for the three and nine months ended September 30, 2013 is $67,095.

126.   The Company's Financial statement restatements were described as follows:

a)   Amortization expense as reported in the financial statements for the three and nine months ended September 30, 2013, in the amount of $529,230 and $1,480,722, respectively, was in error. Based on the restated value of assets purchased from PhytoSphere, intangible assets totaled $4,110,000. Restated amortization on those assets for the three months ended September 30, 2013 is $205,500, representing a decrease in amortization expense and operating expenses of $323,730 for the period. Amortization expense for the nine months ended September 30, 2013 was $548,000 representing a decrease in amortization expense and operating expenses of $932,722 for the period.

b)   Intangible assets as presented in the financial statements as of September 30, 2013 were in error. The financial statements previously reported $4,466,666 in net intangible assets acquired in connection with the PhytoSphere Transaction. As restated, the amount of net intangible assets is $3,562,000. The decrease of $904,666 is a result of a difference of $1,837,387 between $5,947,387 in intangible assets originally recorded and $4,110,000 in intangible assets determined by the valuation of assets purchased from PhytoSphere. This was partially offset by a difference of $932,722 of accumulated amortization recorded as of September 30, 2013.

c)   Goodwill reported in the financial statements at September 30, 2013, was understated by $1,855,512. The goodwill as originally reported was $26,998,125, previously determined based on a transaction amount of $35,000,000 for the PhytoSphere Transaction, which was offset by an

54

impairment to goodwill of $26,998,125 for a net carrying value of $0. The valuation of acquired assets, discussed below, set a value of goodwill of $1,855,512, with no impairment being recorded.

d)      The amount previously reported as due to PhytoSphere pursuant to the PhytoSphere Agreement at September 30, 2013 was reported as $6,499,998. This was calculated based on a Transaction amount of $35,000,000 and a set per share price between $4.50 and $6.00 under the PhytoSphere Agreement. In reviewing the price that the Company's common stock was trading at during the year, subsequent to September 30, 2013, management determined that using a per share price to value the Transaction may not represent a true measure of the fair market value of the Transaction and that obtaining a valuation of the assets purchased from PhytoSphere would be required in order to determine the fair market value of the business acquired. Accordingly, management determined that the valuation of $8,020,000 represented a more reliable measure of the fair value of the Transaction. As a result of that valuation, the per share price for shares of common stock issued to PhytoSphere was adjusted to $1.21 to reflect the revised value of the Transaction. Accordingly, the amount recorded upon issuance of the shares of common stock to PhytoSphere and the total amount due to PhytoSphere was adjusted to reflect the value of the Transaction. As a result, the amount due to PhytoSphere was revised to $1,314,878 and the value of common stock reflected for the shares of common stock issued as payment in the Transaction was $5,755,122. *As a result, the amount shown as due to PhytoSphere at September 30, 2013 was overstated by $5,185,120 and the amount recorded for the shares of common stock issued to PhytoSphere through September 30, 2013 was overstated by $21,794,880. (emphasis added).*

e)      General and administrative expenses originally reported for the three and nine months ended September 30, 2013 were overstated by $461,226 and $1,070,218, respectively. Amortization expense was overstated by $323,730 for the three months ended September 30, 2013 and $932,722 for the nine months ended September 30, 2013 due to a difference in the value of intangible assets originally recorded of $5,947,387 and $4,110,000, as determined based on the valuation of assets acquired by PhytoSphere discussed above. In addition, $137,496 in research and development expenses were originally included in general and administrative expenses for both the three and nine months ended September 30, 2013 which have been reclassified as research and development expenses.

///

> f)      For the three and nine months ended September 30, 2013, the Company originally reported impairment to goodwill in the amount of $26,998,125, which represented the entire amount of goodwill originally reported.  As determined in the valuation of assets purchased from PhytoSphere discussed above, goodwill was determined to be $1,855,512. The Company has determined that there should no impairment to goodwill, as adjusted, at September 30, 2013.

127.    On April 3, 2014, CannaVest filed a Form 8-K, which disclosed that CannaVest's Forms 10-Q for the quarterly periods ended March 31, 2013, June 30, 2013, and September 30, 2014 would be restated to correct material deficiencies in these filings.  In response to this disclosure, the price of CannaVest's stock dropped by $7.30 per share.

128.    On April 14, 2014, CannaVest filed a Form 8-K, which disclosed material misstatements in the figures presented in the financial statements which appeared in the above referenced initially filed Form 10-Q as follows:

> On March 28, 2014, management of CannaVest Corp. (the "Company") concluded that the previously issued financial statements contained in the Company's Quarterly Reports on Form 10-Q for the quarters ended March 31, 2013, June 30, 2013 and September 30, 2013 (the "Forms 10-Q") should no longer be relied upon because of errors related to the purchase price and the purchase price allocation for the assets acquired (the "Assets") related to PhytoSphere Systems, LLC ("PhytoSphere").
>
> Specifically, management determined that the purchase price and the allocation of the purchase price as previously disclosed in the Forms 10-Q were not in accordance with accounting principals generally accepted in the United States ("GAAP"). The Company initially reported the acquisition of the Assets (the "Transaction") based on the negotiated purchase price of $35 million which had a floor and ceiling locked on the value of the Company's common stock to be issued of between $4.50 and $6.00, as reflected in the Agreement for Purchase and Sale of Assets entered into by the Company and PhytoSphere.  In reviewing the price that the Company's common stock was trading at during the year, management determined that although the negotiated price of the Transaction was $35 million, that price may not represent the fair market value of the Assets acquired.  As a result, management determined that obtaining a valuation of the Assets would be required in order to determine the fair value

of the Assets acquired.  The valuation resulted in a fair value of approximately $8 million.

Accordingly, management concluded that the valuation of $8 million for the Assets to be the most reliable measure of fair value of the Transaction for the Company.  In addition, management determined that sales and cost of sales for the quarter ended March 31, 2013 were incorrect.

The Company has determined that it is necessary to correct such errors for the adjusted value of the Transaction and the shares of the Company's common stock issued and to adjust the asset allocation methodology for the Transaction as originally determined by management.  As a result, the carrying amount of intangible assets and goodwill in the Company's condensed consolidated balance sheets filed with the Forms 10-Q will be reduced.  Further, the resulting amortization cost recorded to the condensed consolidated statements of operations filed with the Forms 10-Q will be decreased by $241,167, $367,825 and $323,730 for the quarters ended March 31, 2013, June 30, 2013 and September 30, 2013, respectively.  The restated amortization cost will be $137,000, $205,500 and $205,500 for the quarters ended March 31, 2013, June 30, 2013 and September 30, 2013, respectively, resulting in $548,000 total amortization expense as opposed to $1,480,722 as originally reported.

Goodwill was reported as $26,998,125 at March 31, 2013 and June 30, 3013, in the condensed consolidated balance sheets with an impairment of goodwill in the amount of $26,998,125 recorded in the condensed consolidated statement of operations for the quarter ended September 30, 2013. Goodwill will be restated as $1,855,512 and there will be no impairment to goodwill recorded.  Therefore, as restated, goodwill will be reported as $1,855,512 on the condensed consolidated balance sheets as of March 31, 2013, June 30, 2013 and September 30, 2013.  In addition to the adjustments to the Transaction accounting, sales and cost of sales for the quarter ended March 31, 2013 were misstated.    Sales originally were reported as $1,275,000 will be restated to $1,082,375, representing a reduction of $192,625.    This amount is being restated to correct an error whereby the sales value of good transferred for manufacturing was included in sales. Cost of goods sold were reported as $501,500 for the quarter ended March 31, 2013, and will be restated to $205,450, representing a reduction of $296,050.    The restatement to cost of goods sold is to correct an error related to the cost of inventory sent for manufacturing in the amount of $39,865 being included in cost of goods sold and $256,185 relating to errors related to calculating ending inventory. Sales and cost of sales for the quarters ended June 30, 2013 and September 30, 2013 will not be restated.

> As originally reported in the Forms 10-Q, operating expenses were $435,559, $1,131,660 and $27,998,112 for the three (3)-month periods ended March 31, 2013, June 30, 2013, and September 30, 2013, respectively.  Operating expenses will be restated to $194,342, $419,002 and $791,369 for the three (3)-month periods ended March 31, 2013, June 30, 2013 and September 30, 2013, respectively, for a total of $1,404,763 for the nine months ended September 30, 2013, representing a total reduction of operating expenses of $27,930,846 from what was originally reported.

129.   In response to this April 14, 2014 disclosure, the price of CannaVest's stock dropped by $4.49 per share.

130.   The financial position and results of operations which were reported in the three above referenced Form 10-Q's, as originally filed with the SEC, were materially misstated through improper accounting for goodwill, sales, cost of goods sold, and accounts receivable.  In addition, the financial position and results of operations were materially false and misleading because related party transactions (including 100% of CannaVest's reported revenue and $26,998,125 of CannaVest's fictitious goodwill), comprised virtually all of CannaVest's transactions which were material facts concealed from the investing public.

131.   Generally Accepted Accounting Principles ("GAAP") notes (ASC 850) that the reliability of financial information involves assurance that accounting measures represent what they purport to represent.  It further notes that, without disclosure to the contrary, there is a general presumption that transactions reflected in financial statements have been consummated on an arms-length basis between independent parties.  However, that presumption is not justified when related party transactions exist because the requisite conditions of competitive, free-market dealings may not exist.  Because it is possible for related party transactions to be arranged to obtain certain results desired by the related parties, the resulting accounting measures may not represent what they usually would be expected to represent.  Because of this GAAP states that information about transactions with related parties is useful to users of financial statements in attempting to compare an enterprise's results of operations and

financial position with those of prior periods and with those of other enterprises.   It helps them to detect and explain possible differences.   Therefore, information about transactions with related parties that would make a difference in decision making should be disclosed so that users of the financial statements can evaluate their significance.

132.   In addition, GAAP mandates that "financial statements shall include disclosures of material related party transactions" and that disclosures "shall" include: "A description of the transactions, including transactions in which no amounts or nominal amounts were ascribed, for each of the periods for which income statements are presented, and such other information deemed necessary to an understanding of the effects of the transactions on the financial statements."

133.   As part of Accounting Series Release No. 280, General Revisions of Regulation S-X, the Securities and Exchange Commission integrated the GAAP required disclosure requirements pertaining to related party transactions into Regulation S-X.

134.   The above referenced CannaVest financial statements, which were disseminated to the investing public, failed to comply with the foregoing GAAP.  In this regard, although material (as the term is defined in SEC Staff Accounting Bulletin No. 99 - "Materiality") amounts of related party transactions occurred, none of the above specified initial SEC filings or the financial statements contained therein disclosed information which was necessary to an understanding of the effects of the transactions on the financial statements.

135.   In disregard of their fiduciary responsibility to shareholders, the Individual Defendants flagrantly violated the provisions of CannaVest's Code Of Business Conduct which provide that:

(a)   "Senior Financial Officers will exhibit and promote high standards of honest and ethical conduct"

(b)   "Senior Financial Officers . . . will prohibit and eliminate the appearance or occurrence of conflicts between what is in the best interest of the

///

Company and what could result in material personal gain for a member of the Company's financial organization, including Senior Financial Officers."

        (c)    "Senior Financial Officers will establish and manage the Company's transaction and reporting systems and procedures to ensure that:

- Business transactions are properly authorized and recorded on the Company's books and records in accordance with GAAP and established company financial policies.

- Periodic financial communications and other documents reports filed with, or submitted to, the U.S. Securities and Exchange Commission, and other public communications by the Company, are delivered in a manner that facilitates full, fair, accurate, timely and understandable disclosure so that readers and users can reasonably quickly and accurately determine their significance and consequences."

136.   On February 15, 2014, CannaVest issued a press release touting its subsidiary PhytoSphere's increased production capabilities. The release entitled "PhytoSPHERE Systems, a CannaVest Corp. Subsidiary, Significantly Increased Hemp Oil Production for 2014, PhytoSPHERE Systems Increases Production by Over 1500% From 2013" provided in part:

LAS VEGAS, Feb. 5, 2014 (GLOBE NEWSWIRE) -- CannaVest Corp. (OTC:CANV), the world's leading cannabis-based investment company spearheading the development of cannabidiol (CBD)-rich hemp oils and other industry-related products and services, is pleased to announce that its subsidiary, PhytoSPHERE Systems, has increased its industrial hemp oil production over 1500% for the 2014 season. The company has also increased its production capabilities to concentrate these hemp oils into high value CBD-rich hemp oils, from the rate of several kilograms per batch production cycle in 2013 to over twenty tons per batch production cycle for 2014.

"With this drastic increase in our production and our refining capabilities, we will continue to be able to significantly decrease our production costs and increase our operating margins," stated Michael Mona Jr., President and Chairman of the Board for CannaVest Corp. "The market interest in CBD-rich hemp oils has significantly increased over the past year, due in large part to the many remarkable documentaries and publicity surrounding the positive benefits of cannabis, specifically natural cannabidiol. We are at

the forefront of hemp oil production today, and as the legal markets continue to expand we are one of the few companies actually able to capture and benefit from that increased demand."

137.   The above statements in each of the 2013 Forms 10-Q and in the June 20, 2013 and February 15, 2014 press releases were materially false and misleading when made because they misrepresented and failed to disclose the following adverse facts, which were known to Defendants or recklessly disregarded by them:

(a)   that the price of CannaVest's stock was artificially inflated as a result of Defendants' manipulation;

(b)   that the Company misrepresented the value of the PhytoSphere transaction;

(c)   that the Company omitted the related party source of, and inflated, its sales and revenues;

(d)   that the Company misrepresented, and overstated, the amount of its goodwill and intangible assets;

(e)   that the Company misrepresented that CannaVest's financial statements complied with GAAP when they did not; and

(f)   that the Company materially omitted that CannaVest's revenues in first, second and third quarters 2013 were generated from sales to Medical Marijuana, Inc., a related party.

## **BREACH OF FIDUCIARY DUTY IS REVEALED**

138.   On March 6, 2014, CannaVest issued a press release entitled "CannaVest Corp. Clarifies Relationships With General Hemp and Kannaway," both companies controlled by Titus:

SAN DIEGO, March 6, 2014 (GLOBE NEWSWIRE) -- CannaVest Corp. (OTC:CANV), the world's leading hemp-based investment company spearheading the development of cannabidiol (CBD)-rich hemp oils and other hemp industry-related products and services, would like to clarify its relationship with both General Hemp, LLC and Kannaway, LLC.

Kannaway, LLC is marketed as a hemp lifestyle company with a focus on nutritional wellness whose products contain CBD rich hemp oil. Kannaway was founded in 2014 and is a wholly-owned subsidiary of General Hemp, LLC.

The sole owner of General Hemp is Stuart Titus. Mr. Titus formerly was a consultant and advisor to CannaVest, and currently owns less than 2% of the outstanding shares of CannaVest. Mr. Titus no longer has any affiliation with CannaVest, and no person affiliated with General Hemp is employed by CannaVest in any capacity. The sole relationship between CannaVest and General Hemp is Mr. Titus' ownership of CannaVest stock.

Products for Kannaway's business will exclusively be supplied by HempMedsPX, LLC, which is a distributor of federally legal, hemp-based CBD products and a wholly-owned subsidiary of Medical Marijuana, Inc. (MJNA). HempMeds is the master distributor and marketing company for CannaVest. As a result, CannaVest's product offerings will be available to Kannaway for its business. CannaVest has no ownership or other interest in Kannaway, and CannaVest solely will act as a supplier of products to Kannaway.

"We have received numerous telephone calls from the public leading us to believe there is general confusion relating to our relationship to Kannaway," says Michael Mona III, Vice President of Operations for CannaVest Corp. "Our business focus continues to be on being the world's leading bulk CBD-rich hemp oil supplier, and we intend to continue selling our product offerings to HempMeds, which ultimately will allow Kannaway to launch and sustain its business. We are excited that our products will be available to consumers through the Kannaway model."

139.   In reaction to this news, CannaVest's stock fell dramatically, closing at $85.01 on March 10, 2014 (March 8 and 9 fell on the weekend) from its closing price of $121 per share on March 6, 2014.

140.   On March 14, 2014, Baystreet.ca Media Group Corp., an entity that follows marijuana stocks, reported on the dramatic drop in the price of CannaVest common stock:

In other news, CannaVest Corp. (OTCQB: CANV) share volume soared Mar. 13, with 12,856 changing hands, significantly higher than its three-month average of 9,934 shares.

The surge in the Las Vegas-based developer of hemp-based nutritional products share volume and the downward trend of its stock's price appears to be tied to a Mar. 6 clarification of CannaVest's relationship with both General Hemp LLC and Kannaway LLC.

Clearing Up Confusion

Here's an excerpt from the clarification:

Kannaway, LLC is marketed as a hemp lifestyle company with a focus on nutritional wellness whose products contain CBD rich hemp oil.Kannaway was founded in 2014 and is a wholly-owned subsidiary of General Hemp, LLC.

The sole owner of General Hemp is Stuart Titus. Mr. Titus formerly was a consultant and advisor to CannaVest, and currently owns less than 2% of the outstanding shares of CannaVest. Mr. Titus no longer has any affiliation with CannaVest, and no person affiliated with General Hemp is employed by CannaVest in any capacity. The sole relationship between CannaVest and General Hemp is Mr. Titus' ownership of CannaVest stock.

Products for Kannaway's business will exclusively be supplied by HempMedsPX, LLC, which is a distributor of federally legal, hemp-based CBD products and a wholly-owned subsidiary of Medical Marijuana, Inc. (MJNA). HempMeds is the master distributor and marketing company for CannaVest. As a result, CannaVest's product offerings will be available to Kannaway for its business. CannaVest has no ownership or other interest in Kannaway, and CannaVest solely will act as a supplier of products to Kannaway.

"We have received numerous telephone calls from the public leading us to believe there is general confusion relating to our relationship to Kannaway," says Michael Mona III, vice president of operations for CannaVest Corp.

On Mar. 13, CANV's share price closed at $83.00, down $7.00 from its close of $90.00 cents the previous day.

141.   On March 24, 2014, Gannet News Service published an article commenting on the decline in the price of CannaVest's stock:

Wall Street seems to be losing its appetite for pot.

Marijuana stocks were high fliers -- so to speak -- after Colorado and Washington legalized recreational use and several other states announced they may legalize sales or decriminalize possession. Shares in about 20 marijuana-related companies soared, with some gaining more than 700(PERCENT) off 52-week lows.

But marijuana mania is fading as investors realize there's more smoke than fire at many companies, which show "pot-tential" but little actual revenue. CannaVest, which specializes in industrial hemp production, had climbed to $201 a share last month. It closed up 11(PERCENT) to $68.10 Friday, but it's lost nearly two-thirds of its market value.

142.   On March 26, 2014, CannaVest filed with the SEC a Form 8-K disclosing the following:

Item 5.02 Departure of Directors or Certain Officers; Election of Directors; Appointment of Certain Officers; Compensatory Arrangements of Certain Officers.

On March 21, 2014, Karen Epstein resigned as the Treasurer and Secretary of CannaVEST Corporation (the "Company"). Her resignation did not result from any disagreement with the Company.

63

On March 21, 2014, the Board of Directors of the Company appointed Allen Shubat, age 59, as the Treasurer and Secretary of the Company. Mr. Shubat is experienced in streamlining operations and improving internal control over financial reporting, with an emphasis in corporate consolidations in the U.S. and globally. Mr. Shubat is a 20-plus year veteran working with biofuel, telecommunications, real estate investment, development, and property management firms. From 2012 to 2014, Mr. Shubat was Controller for SG Biofuels, Inc., where he coordinated GAAP consolidated financial statements and investments in three countries. From 2008 to 2011, Mr. Shubat was Controller for PacVentures where he oversaw accounting for 40+ business units in 5 states and 3 satellite offices, providing consolidated financial statements, tax and audit work papers. Mr. Shubat also previously worked for TelMex USA, LLC, a Carlos Slim subsidiary. There he tracked a $200MM investment portfolio in the U.S. and in South American countries. Mr. Shubat's extensive business and accounting background makes him a valuable addition to the Company.

143.   On March 27, 2014, the price of CannaVest's stock closed at $47.50 per share, down from of it closing price of $60 on March 25, 2014.

144.   On April 3, 2014, CannaVest filed a Form 8-K with the SEC announcing that it had misreported its financial position and misreported its results of operations in its financial statements in the Company's Forms 10-Q for the quarters ended March 31, 2013, June 30, 2013, and September 30, 2013, and as such, the 2013 First, Second, and Third Quarter Forms 10-Q, including the financial statements contained therein, could no longer be relied upon. More specifically, the press release stated, in part:

The Company has determined that it is necessary to correct such errors because the allocation methodology used by management, resulting carrying amount of intangible assets and goodwill, and the resulting amortization cost and goodwill impairment were not in accordance with GAAP. Further, sales and cost of sales for the quarter ended March 31, 2013 were misstated. ***The Company will restate the Company's Quarterly Reports on Form 10-Q for the quarters ended March 31, 2013, June 30, 2013 and September 30, 2013.***

(Emphasis added).

145.   In reaction to this adverse disclosure, on April 3, 2014 shares of the Company's stock fell $7.30 per share, or more than 20%, to close at $25.30 per share.

146.   On April 3, 2014, the *Street.com* reported on the stock drop in an article entitled "Why CannaVEST (CANV) Stock Is Down Today: CannaVEST (CANV) stock

is down Thursday after filing a report showing that it made material errors in its 10-Qs

for the first three quarters of 2013":

> NEW YORK (TheStreet) -- CannaVEST Corp stock is down 20.46% to $25.50 Thursday after filing a report showing that it made material errors in its 10-Qs for the first three quarters of 2013.
>
> The report states the company "concluded that the previously issued financial statements contained in the company's quarterly reports on Form 10-Q for the quarters ended March 31, 2013, June 30, 2013 and September 30, 2013 should no longer be relied upon because of errors related to the purchase price and the purchase price allocation for the assets acquired related to the PhytoSPHERE Systems."
>
> The company determined the purchase price disclosed on the 10-Q forms "were not in accordance with accounting principles generally accepted in the U. S."
>
> CannaVest, a business which develops and sells products containing hemp, concluded their sales and cost of sales for March 31, 2013 were incorrect.

147.   On April 14, 2014, CannaVest filed an Amended Form 8-K, stating in greater detail the circumstances of Defendants' misrepresentations. The Amended Form 8-K disclosed:

> **Non-Reliance on Previously Issued Financial Statements or a Related Audit Report or Completed Interim Review**
>
> On March 28, 2014, management of CannaVEST Corp. (the "Company") concluded that the previously issued financial statements contained in the Company's Quarterly Reports on Form 10-Q for the quarters ended March 31, 2013, June 30, 2013 and September 30, 2013 (the "Forms 10-Q") should no longer be relied upon because of errors related to the purchase price and the purchase price allocation for the assets acquired (the "Assets") related to PhytoSPHERE Systems, LLC ("PhytoSPHERE"). Specifically, management determined that the purchase price and the allocation of the purchase price as previously disclosed in the Forms 10-Q were not in accordance with accounting principals generally accepted in the United States ("GAAP"). The Company initially reported the acquisition of the Assets (the "Transaction") based on the negotiated purchase price of $35 million which had a floor and ceiling locked on the value of the Company's common stock to be issued of between $4.50 and $6.00, as reflected in the Agreement for Purchase and Sale of Assets entered into by the Company and PhytoSPHERE. In reviewing the price that the Company's common stock was trading at during the year, management determined that although the negotiated price of the Transaction was $35 million, that price may not represent the fair market value of the Assets acquired. As a result, management determined that obtaining a valuation of the Assets would be required in order to determine the fair value of the Assets acquired. The

valuation resulted in a fair value of approximately $8 million. Accordingly, management concluded that the valuation of $8 million for the Assets to be the most reliable measure of fair value of the Transaction for the Company. In addition, management determined that sales and cost of sales for the quarter ended March 31, 2013 were incorrect.

The Company has determined that it is necessary to correct such errors for the adjusted value of the Transaction and the shares of the Company's common stock issued and to adjust the asset allocation methodology for the Transaction as originally determined by management. As a result, the carrying amount of intangible assets and goodwill in the Company's condensed consolidated balance sheets filed with the Forms 10-Q will be reduced. Further, the resulting amortization cost recorded to the condensed consolidated statements of operations filed with the Forms 10-Q will be decreased by $241,167, $367,825 and $323,730 for the quarters ended March 31, 2013, June 30, 2013 and September 30, 2013, respectively. The restated amortization cost will be $137,000, $205,500 and $205,500 for the quarters ended March 31, 2013, June 30, 2013 and September 30, 2013, respectively, resulting in $548,000 total amortization expense as opposed to $1,480,722 as originally reported.

Goodwill was reported as $26,998,125 at March 31, 2013 and June 30, 3013, in the condensed consolidated balance sheets with an impairment of goodwill in the amount of $26,998,125 recorded in the condensed consolidated statement of operations for the quarter ended September 30, 2013. Goodwill will be restated as $1,855,512 and there will be no impairment to goodwill recorded. Therefore, as restated, goodwill will be reported as $1,855,512 on the condensed consolidated balance sheets as of March 31, 2013, June 30, 2013 and September 30, 2013.

In addition to the adjustments to the Transaction accounting, sales and cost of sales for the quarter ended March 31, 2013 were misstated. Sales originally were reported as $1,275,000 will be restated to $1,082,375, representing a reduction of $192,625. This amount is being restated to correct an error whereby the sales value of good transferred for manufacturing was included in sales. Cost of goods sold were reported as $501,500 for the quarter ended March 31, 2013, and will be restated to $205,450, representing a reduction of $296,050. The restatement to cost of goods sold is to correct an error related to the cost of inventory sent for manufacturing in the amount of $39,865 being included in cost of goods sold and $256,185 relating to errors related to calculating ending inventory. Sales and cost of sales for the quarters ended June 30, 2013 and September 30, 2013 will not be restated.

As originally reported in the Forms 10-Q, operating expenses were $435,559, $1,131,660 and $27,998,112 for the three (3)-month periods ended March 31, 2013, June 30, 2013, and September 30, 2013, respectively. Operating expenses will be restated to $194,342, $419,002 and $791,369 for the three (3)-month periods ended March 31, 2013, June 30, 2013 and September 30, 2013, respectively, for a total of $1,404,763 for the nine months ended September 30, 2013, representing a total reduction of operating expenses of $27,930,846 from what was originally reported.

The Company will restate the financial statements contained in the Forms 10-Q and file these restatements prior to filing its Quarterly Report on Form 10-Q for the quarter ended March 31, 2014, which is due to be filed by May 15, 2014.

The decision to restate the disclosure and the underlying issues discussed above were discussed by the Company's Chief Executive Officer with the Company's independent registered public accounting firm. The decision to restate the disclosure was made after discovery of such errors relating to the Company's disclosures and the aforementioned discussions were held with the Company's independent registered public accounting firm prior to the filing on March 28, 2014, of the Company's Annual Report on Form 10-K for the fiscal year ended December 31, 2013 (the "Form 10-K"). The Form 10-K, Item 9A "Controls and Procedures", disclosed that management was aware of a deficiency related to the improper determination of the purchase price allocation for the Assets, and stated that the Forms 10-Q could not be relied upon as a result of including materially incorrect information.

148.   After this disclosure, the price of shares of the Company's stock fell again, this time by $4.49 per share, or 19.5%, to close at $18.51 per share.

149.   On April 24, 2014, CannaVest filed its restated financial statements for the first, second, and third quarters of 2013 with the SEC on three separate Forms 10-Q/A.

150.   Finally, on April 25, 2014, the Company announced that it had filed restated financial statement statements for the quarters ended March 31, 2013, June 30 2013 and September 30, 2013. Specifically, CannaVest stated in part as follows:

The purpose of the restatement is to address the following items, which the Company has identified as requiring correction:

**Recognition of Revenue**

The financial statements for the quarter ended March 31, 2013 reflected revenue and accounts receivable of $192,625 and cost of goods sold of $296,050 that should not have been recognized. Revenues and accounts receivable in the amount of $192,625 related to the sales value of inventory that was transferred to a manufacturer for inclusion in finished goods and an error in calculating the price of the ending inventory as of the end of the period. The amount of $39,865 was related to the cost of inventory sent for manufacturing being included in cost of goods sold and $256,185 related to errors related to calculating ending inventory.

**Prepaid Inventory**

A portion of the prepaid inventory purchased as part of the Company's acquisition of assets from PhytoSPHERE Systems, LLC

("PhytoSPHERE") was not included in the financial statements as of March 31, 2013. The resulting understatement of prepaid inventory was $1,260,510.

**Inventory**

Inventory as originally reported in the financial statements ended March 31, 2013, was understated by $125,027. This was a result of an overstatement of cost of goods sold in the amount of $296,050, offset by an adjustment for the value of inventory acquired from PhytoSPHERE in the amount of $171,023.

**Value of Intangible Assets**

Intangible assets as presented in the financial statements as of March 31, June 30 and September 30, 2013 were in error. As determined by the valuation of the assets purchased from PhytoSPHERE, intangible assets totaled $4,110,000. Net intangible assets previously reported at March 31, 2013 were $33,656,833, which represents an overstatement of $29,683,833. Net intangible assets previously reported at June 30, 2013 were $4,995,895, which represents an overstatement of $1,228,395 and net intangible assets previously reported at September 30, 2013 were $4,466,666, resulting in an overstatement of $904,666.

**Goodwill**

As determined by the valuation of assets purchased from PhytoSPHERE, the value of goodwill was $1,855,512. The Company did not report any goodwill as of March 31, 2013, which resulted in an understatement of $1,855,512. At June 30, 2013, the Company reported goodwill in the amount of $26,998,125, resulting in an overstatement of goodwill of $25,142,613. At September 30, 2013, the Company recorded impairment of goodwill in the amount of $26,998,125, resulting in a carrying value of $0. This resulted in an understatement of goodwill in the amount of $1,855,512.

**Amount Due to PhytoSPHERE Systems; Additional Paid in Capital**

The amount due to PhytoSPHERE was originally reported as $35 million, pursuant to the terms of the agreement. Shares to be issued as payment under the transaction were at a set per share price between $4.50 and $6.00. Subsequently, a valuation determined the price of the transaction to be $8,020,000, which resulted in a per share price of $1.21 per share based on the valuation obtained. Therefore, for the Company's financial reports, the amount due to PhytoSPHERE was adjusted to $8,020,000 and the shares issued as payment pursuant to the transaction were adjusted to $1.21 per share. This resulted in an overstatement of the amount due PhytoSPHERE and paid-in capital of $23,572,360 and $3,407,640, respectively at March 31, 2013; $18,786,094 and $8,193,906, respectively at June 30, 2013; and $5,185,120 and $21,794,880, respectively at September 30, 2013.

///

**Amortization Expense**

The restatement of the value of intangible assets has resulted in the overstatement of amortization expense for the quarters ended March 31, June 30 and September 30, 2013 in the amount of $241,167, $367,825 and $323,730, respectively. The overstatement of amortization expense was $608,992 for the six months ended June 30, 2013 and $932,722 for the nine months ended September 30, 2013.

**Impairment of Goodwill**

The Company originally reported $26,998,125 as an impairment to goodwill for the quarter ended September 30, 2013. The Company did not record an impairment to goodwill in its restated financial statements. This resulted in an overstatement of operating expenses of $26,998,125 for the three and nine months ended September 30, 2013.

**Research & Development Expenses**

For the quarter ended September 30, 2013, the Company included $137,496 in research and development expenses as a part of general and administrative expenses. This amount has been reported as research and development expenses in the restated financial statements.

The cumulative impact on the Company's financial statements are described in more detail below.

151.   On or about November 24, 2014, the Company received a subpoena from the SEC requesting certain documents and information.

152.   In the related securities fraud action, the court in the Southern District of New York ("SDNY Court") issued a written Memorandum Opinion and Order on March 31, 2018 which denied in the main the motion to dismiss filed in that action by Defendants CannaVest and Mona.

153.   In addition, the SEC brought an action against Defendants CannaVest and Mona in the District of Nevada, Civil Action No. 2:17-cv-01681 ("SEC Action").

154.   The SEC Action has been settled in principal though the SEC commissioners have not finished their review of the proposed settlement.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

155.   Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress injuries suffered and to be suffered as a direct and proximate result

///

of the breaches of fiduciary duties and gross mismanagement by the Individual Defendants.

156.   Plaintiff will adequately and fairly represent the interests of the Company and its shareholders in enforcing and prosecuting its rights and has retained counsel competent and experienced in derivative litigation.

157.   Plaintiff is a current owner of the Company stock and has continuously been an owner of Company stock from February  24, 2014 to the present, during all times relevant to the Individual Defendants' wrongful course of conduct alleged herein. Plaintiff understands her obligation to hold stock throughout the duration of this action and is prepared to do so.

158.   During the illegal and wrongful course of conduct at the Company and through the present, the Board consisted of the Individual Defendants.  Because of the facts set forth throughout this Complaint, demand on the Company Board to institute this action is not necessary because such a demand would have been a futile and useless act.

159.   The Company Board is currently comprised of three (3) members – Defendants Mona, MacKay, and Raskin.  Thus, Plaintiff is required to show that a majority of the Demand Defendants, *i.e.*, two (2), cannot exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this action.

160.   Defendants Mona and Mackay face a substantial likelihood of liability in this action because they caused the Company to issue false and misleading statements concerning its financial results and future prospects.  Because of their advisory, executive, managerial, and directorial positions with the Company, Defendants Mona and Mackay had knowledge of material non-public information regarding the Company and was directly involved in the operations of the Company at the highest levels.

///

///

161.   Defendants Mona and Mackay either knew or should have known of the false and misleading statements that were issued on the Company's behalf and took no steps in a good faith effort to prevent or remedy that situation.

162.   The Individual Defendants (or at the very least a majority of them) cannot exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this action.  For the reasons that follow, and for reasons detailed elsewhere in this Complaint, Plaintiff has not made (and should be excused from making) a pre-filing demand on the Board to initiate this action because making a demand would be a futile and useless act.

163.   Defendants Mona and Mackay approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from the Company's stockholders or recklessly and/or with gross negligence disregarded the wrongs complained of herein and are therefore not disinterested parties.

164.   Defendants Mona and Mackay authorized and/or permitted the false statements to be disseminated directly to the public and made available and distributed to shareholders, authorized and/or permitted the issuance of various false and misleading statements, and are principal beneficiaries of the wrongdoing alleged herein, and thus, could not fairly and fully prosecute such a suit even if they instituted it.

165.   Because of their participation in the gross dereliction of fiduciary duties, and breaches of the duties of due care, good faith, and loyalty, Defendants Mona and Mackay are unable to comply with their fiduciary duties and prosecute this action.  They are in a position of irreconcilable conflict of interest in terms of the prosecution of this action and defending themselves in the securities fraud class action lawsuit brought under the Securities Exchange Act of 1934.

166.   Additionally, each of the Individual Defendants received payments, benefits, stock options, and other emoluments by virtue of their membership on the Board and their control of the Company.

///

**The Individual Defendants Are Not Independent or Disinterested**

**Defendant Mona**

167.   Defendant Mona is not disinterested or independent, and therefore, is incapable of considering demand because Defendant Mona (as President and CEO) is an employee of the Company who derives substantially all of his income from his employment with CannaVest, making him not independent.  As such, Defendant Mona cannot independently consider any demand to sue himself for breaching his fiduciary duties to CannaVest, because that would expose him to liability and threaten his livelihood.

168.   Accordingly, Defendant Mona lacks independence from Defendants Mackay and Raskin, defendants who are not disinterested and who exert influence over defendant Mona's compensation by virtue of their positions as representing the entire Compensation Committee.

169.   This lack of independence and financial benefits received by Defendant Mona renders him incapable of impartially considering a demand to commence and vigorously prosecute this action.

170.   Further, Defendant Mona owns 2,250,000 shares (6.69% of the beneficially owned shares) of Company stock.  Where, as here, the controlling shareholder is a named defendant, demand futility is presumed.

171.   Further, on March 1, 2013, Defendants Mona and Mackay caused the Company to issue a Promissory Note (the "Note") to Roen Ventures, LLC ("Roen Ventures") in exchange for loans provided and to be provided in the future in an amount of up to $2,000,000, subsequently increased to $6,000,000.

172.   Defendant Mona was, during the Relevant Period, a member of Roen Ventures.

173.   As of December 31, 2013, the principal balance of the Note was $6,092,069.

///

174.   On January 27, 2014, the Company converted $6,000,000 of the Note balance into 10,000,000 shares of common stock of the Company pursuant to the terms of the Note, as amended.

175.   On January 28, 2014, Defendants Mona and Mackay caused the Company to repay Roen Ventures accrued interest on the Note in the amount of $187,453 and principal under the Note in the amount of $92,069.

**Defendant Mackay**

176.   Defendant Mackay owns 16,839,518 shares (50.10 % of the beneficially owned shares) of Company stock.  Where, as here, the controlling shareholder is a named defendant, demand futility is presumed.

177.   Defendant MacKay is a member of Roen Ventures.

**Litigation Against CannaVest, Mona and Roen Ventures**

178.   On March 8, 2008, Far West Industries ("Far West") sued Mona and others for damages resulting from fraud arising out of a land transaction in California (the "California Action").

179.   On February 23, 2012, a judgment was entered in the California Action in favor of Far West against Mona and others in the amount of $17,777,562.

180.   On October 18, 2012, the judgment in the California Action was domesticated in Nevada and enforcement proceedings commenced including, but not limited to an examination of Mona as a judgment debtor, and garnishments of various accounts belonging to Mona.

181.   On February 20, 2014, Far West filed a Second Amended Complaint in District Court, Clark County, Nevada entitled *Far West Industries v. CannaVest Corp., Roen Ventures, LC, Michael Mona, Jr., and Bart Mackay*, Case No.: A-14-695786-C ("*Far West action*").

182.   Though CannaVest has been dismissed from the *Far West action*, The *Far West Complaint* alleged that in the judgment debtor exam, Mona testified, among other things, that in 2013, he received in excess of $3 million from a brokerage account, which

he then loaned to Roen Ventures, and which was then loaned by Roen Ventures to CannaVest.

183. The *Far West action* further alleged that Mona also testified during that proceeding that after the $3 million was loaned from Roen Ventures to CannaVest, Mackay offered Mona $500,000 to buy the note that Mona made to Roen Ventures and to buy out Mona's interest in Roen Ventures.

184. The *Far West action* further alleged that Mona agreed, and for the sum of $500,000, sold Roen Ventures' $3 million debt along with Mona's interest in Roen Ventures to MacKay.

**Defendant Raskin**

185. Defendant Raskin owns 400,000 shares (1.19% of beneficially owned shares) of Company stock.

186. Below is a summary of the percent of the Company common stock beneficially owned (*see* DEF14A, dated July 2, 2014):

| Name and Address of Beneficial Owner (1) | Number of Shares of Common Stock Beneficially Owned (2) | Percent of Common Stock Beneficially Owned |
|---|---|---|
| Mai Dun Limited, LLC (3) | 5,739,518 | 17.07% |
| Roen Ventures, LLC (3) | 10,000,000 | 29.75% |
| PhytoSPHERE Systems, LLC (4) | 4,425,000 | 13.16% |
| Larry Raskin | 400,000 | 1.19% |
| Michael Mona, Jr. | – | – |
| Bart Mackay (3) | 16,839,518 | 50.10% |
| Allen Shubat | – | – |
| Joseph Dowling | – | – |
| Michael Mona, III | 2,250,000 | 6.69% |
| All executive officers and directors as a group (three persons) | 16,124,518 | 57.98% |

## FIRST CAUSE OF ACTION

### (Against The Individual Defendants for Breach of Fiduciary Duties)

187. Plaintiff incorporates by reference and re-alleges each and every allegation contained above, as though fully set forth herein.

///

///

74

188.   The Individual Defendants owe the Company fiduciary obligations.  By reason of their fiduciary relationships, the Individual Defendants owed and owe the Company the highest obligation of good faith, fair dealing, loyalty, and due care.

189.   The Individual Defendants violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, and good faith.

190.   The Individual Defendants engaged in a sustained and systematic failure to properly exercise their fiduciary duties.  Among other things, the Individual Defendants breached their fiduciary duties of loyalty and good faith by allowing the Company to improperly misrepresent the Company's publicly reported financials.  These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

191.   As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, the Company has sustained significant damages.  As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

192.   As a direct and proximate result of the Individual Defendants' breach of their fiduciary duties, the Company has suffered damage, not only monetarily, but also to its corporate image and goodwill.  Such damage includes, among other things, costs associated with defending securities lawsuits, severe damage to the share price of the Company, resulting in an increased cost of capital, the waste of corporate assets, and reputational harm.

## SECOND CAUSE OF ACTION

### (Against The Individual Defendants for Gross Mismanagement)

193.   Plaintiff incorporates by reference and re-alleges each allegation contained above, as though fully set forth herein.

194.   By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary

///

1   duties with regard to prudently managing the assets and business of the Company in a
2   manner consistent with the operations of a publicly held corporation.

3        195.   As a direct and proximate result of the Individual Defendants' gross
4   mismanagement and breaches of duty alleged herein, the Company has sustained
5   significant damages in excess of millions of dollars.

6        196.   Because of the misconduct and breaches of duty alleged herein, the
7   Individual Defendants are liable to the Company.

8                        **THIRD CAUSE OF ACTION**
9           **(Against The Individual Defendants for Abuse of Control)**

10       197.   Plaintiff incorporates by reference and re-alleges each and every allegation
11  set forth above, as though fully set forth herein.

12       198.   The Individual Defendants' misconduct alleged herein constituted an abuse
13  of their ability to control and influence the Company, for which they are legally
14  responsible.

15       199.   As a direct and proximate result of the Individual Defendants' abuse of
16  control, the Company has sustained significant damages.  As a direct and proximate
17  result of the Individual Defendants' breaches of their fiduciary obligations of candor,
18  good faith, and loyalty, the Company has sustained and continues to sustain significant
19  damages.  As a result of the misconduct alleged herein, the Individual Defendants are
20  liable to the Company.

21       200.   The acts and omissions of the Individual Defendants complained of in this
22  Count have been undertaken willfully, knowingly, and maliciously, and/or with reckless
23  disregard for their respective civil obligations, and accordingly the Company is entitled
24  to recover punitive damages with respect to this Count.

25                       **FOURTH CAUSE OF ACTION**
26         **(Against The Individual Defendants For Unjust Enrichment)**

27       201.   Plaintiff incorporates by reference and re-alleges each and every allegation
28  set forth above, as though fully set forth herein.

202.   During the Relevant Period, the Individual Defendants received bonuses, stock options, and/or similar such compensation from the Company that were tied to the financial performance of the Company.   The Individual Defendants were unjustly enriched thereby.

203.   To remedy the Individual Defendants' unjust enrichment, this Court should order them to disgorge their unjustly obtained bonuses and compensation.

204.   The acts and omissions of the Individual Defendants complained of in this Count have been undertaken willfully, knowingly, and maliciously, and/or with reckless disregard for their respective civil obligations, and accordingly the Company is entitled to recover punitive damages with respect to this Count.

## REQUEST FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment as follows:

A.   Determining that this action is a proper derivative action maintainable under law, and that demand is excused;

B.   Awarding, against all the Individual Defendants and in favor of the Company, the damages sustained by the Company as a result of the Individual Defendants' breaches of their fiduciary duties;

C.   Directing the Company to take all necessary actions to reform and improve its corporate governance and internal procedures, to comply with the Company's existing governance obligations and all applicable laws and to protect the Company and its investors from a recurrence of the damaging events described herein;

D.   Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E.   Granting such other and further relief as the Court deems just and proper.

///

///

///

///

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

Dated this 11th day of December 2020.

**MATTHEW L. SHARP, LTD.**

/s/ Matthew L. Sharp
Matthew L. Sharp, Esq.
Nevada Bar No. 4746
432 Ridge St.
Reno, NV 89501
Phone: (775) 324-1500
matt@mattsharplaw.com

-In association with-

Thomas J. McKenna, *Admitted pro hac vice*
Gregory M. Egleston, *Admitted pro hac vice*
**GAINEY McKENNA & EGLESTON**
501 Fifth Avenue, 19th Floor
New York, New York 10017
Phone: (212) 983-1300
tjmckenna@gme-law.com
gegleston@gme-aw.com

*Counsel for Plaintiff*

1

## CERTIFICATE OF SERVICE

2   I hereby certify that on December 11, 2020, I electronically filed the foregoing with the

3 Clerk of the Court using the CM/ECF system which will send notification of such filing to the

4 following:

5   S. Todd Neal, Esq.
    Sean M. Sullivan, Esq.

6   **PROCOPIO, CORY, HARGREAVES & SAVITCH LLP**
    525 B Street, Suite 2200

7   San Diego, CA 92101
    eric.plourde@procopio.com

8   *Attorneys for Defendants Bart P. Mackay, Larry Raskin,*
    *and Nominal Defendant CannaVEST Corp., now known as CV Sciences, Inc.*

9

10   William R. Urga, Esq.
    JOLLEY URGA WOODBURY HOLTHUS & ROSE

11   330 S. Rampart Blvs., Ste. 380
    Las Vegas, NV  89145

12   wru@juwlaw.com

13   *Attorneys for Defendants Bart P. Mackay, Larry Raskin,*
    *and Nominal Defendant CannaVEST Corp., now known as CV Sciences, Inc.*

14

15   Jeffrey A. Garofalo, Esq.
    **PROCOPIO, CORY, HARGREAVES & SAVITCH LLP**

16   3960 Howard Hughes Pkwy., Ste. 500
    Las Vegas, NV  89169

17   jeff.garofalo@procopio.com

18   *Attorneys for Defendant Michael Mona, Jr.*

19

20           */s/ Cristin B. Sharp*
            An employee of Matthew L. Sharp, Ltd.

21

22

23

24

25

26

27

28

## VERIFICATION

I, Otilda Lamont, declare that I have reviewed the Third Amended Verified Shareholder Derivative Complaint ("Complaint") prepared on behalf of CannaVest Corp., now known as CV Sciences, Inc. (hereinafter "CV") and authorize its filing.  I have reviewed the allegations made in the Complaint, and to those allegations of which I have personal knowledge, I believe those allegations to be true.  As to those allegations of which I do not have personal knowledge, I rely on my counsel and their investigation and for that reason believe them to be true.  I further verify that I first purchased the common stock of CV on February 24, 2014, that I have held the common stock of CV continuously to the present date, that I am a current holder of CV common stock, and that it is my intention to continue to hold the common stock of CV.

I verify the foregoing statements under the penalties of perjury.


November 30th, 2020

_____
OTILDA LAMONT